2020 IL App (1st) 181017
No. 1-18-1017
Opinion filed October 19, 2020

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 3599 |
| | ) | |
| ANDREI PAGSISIHAN, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Diane Cannon, |
| | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Walker and Justice Pierce concurred in the judgment and opinion.

**OPINION**

¶ 1　Andrei Pagsisihan pled guilty to one count of first degree murder for the shooting death of Ricky Russo and one count of attempted first degree murder for the shooting of Johnny Vaughn. The circuit court sentenced Pagsisihan to 38 years in prison. He filed a postconviction petition alleging his counsel failed to advise him of the immigration consequences of his plea; namely, that first degree murder constitutes an "aggravated felony" for the purposes of federal immigration law, subjecting him to removal when he completes his sentence. See 8 U.S.C. § 1101(a)(43)(A) (2012); 8 U.S.C. § 1227(a)(2)(A)(iii) (2012).

¶ 2    The trial court advanced Pagsisihan's petition to the second stage and appointed counsel. Documents attached to the petition show an immigration judge ordered him deportable in 1989. But Pagsisihan argued that actions by immigration enforcement officials—including failure to ever deport him and granting him work authorization for a year in 1996—led him to reasonably believe that deportation was not imminent, if it was going to happen at all. According to Pagsisihan's affidavit, had he known that first degree murder was an "aggravated felony," subjecting him to mandatory expedited removal from the United States, he would not have pled guilty because of his substantial family connections to this country and lack of any connection to the Philippines where he was born.

¶ 3    We reverse and remand for an evidentiary hearing, guided by two principles. First, to establish prejudice, Pagsisihan must only show that rejecting a guilty plea and proceeding to trial would have been " 'rational under the circumstances.' " *Lee v. United States*, 582 U.S. ___, ___, 137 S. Ct. 1958, 1968 (2017) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)). Significantly for our purposes, the United States Supreme Court said foregoing a guilty plea is rational (or at least not irrational) when it means the difference between *certain* deportation and *almost certain* deportation. *Id.* at ___, 137 S. Ct. at 1968-69. Accepting Pagsisihan's allegations as true, at the time he pled guilty he certainly knew that he could be deported, not necessarily that he would be. The statutory certainty of the immigration consequences of a murder conviction would have been a rational reason to reject a plea under those circumstances.

¶ 4    Second, we must pay heed to our standard of review. At this stage of postconviction proceedings we accept all well-pled allegations as true and do not engage in any credibility determinations. *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998). The outcome of Pagsisihan's

petition depends on whether a factfinder *believes* his assertions that, before his murder conviction, he did not fear imminent deportation (even if it was a possibility) and would have risked a steeper sentence to avoid a conviction that would have guaranteed his removal. That determination is best made—indeed, can only be made—after an evidentiary hearing.

¶ 5                                    Background

¶ 6     Pagsisihan came to the United States from the Philippines in 1974, at the age of seven, accompanied by his mother. His passport showed he had permission to remain in the United States for three months, until March 19, 1975. He never left.

¶ 7     In 1985, Pagsisihan was convicted of vehicle theft and sentenced to two years' probation and 20 weekends of periodic imprisonment. In 1987, Pagsisihan was convicted of possession of a stolen motor vehicle and sentenced to three years in prison. In 1989, the United States government initiated removal proceedings, seeking to deport Pagsisihan on grounds that (i) he remained in the country longer than he was authorized and (ii) both his 1985 and 1987 criminal convictions were for crimes involving moral turpitude.

¶ 8     During his removal proceedings, Pagsisihan's counsel reported, and the government did not dispute, that his mother was a lawful temporary resident, his father was a lawful permanent resident, his sister was a citizen, and he had a daughter who was a citizen. The only question before the immigration court was the legal question of whether the offense of possession of a stolen motor vehicle counted as a crime of moral turpitude. The immigration judge, while expressing sympathy for Pagsisihan's personal circumstances, found he had been convicted of two crimes involving moral turpitude and "deportability ha[d] been established by clear, convincing, and unequivocal evidence." Pagsisihan was ordered "deported from the United States to the Philippines," though

the judge told him: "My order is not self-executing. There are provisions for…what's the expression…deferred action, if the respondent has the requisite extreme hardship." The Board of Immigration Appeals dismissed Pagsisihan's appeal finding the immigration judge correctly found both of his convictions to be crimes of moral turpitude.

¶ 9 The government, however, never removed Pagsisihan from the United States. In 1993, according to a Cook County marriage license attached to his postconviction petition, he married Nora Isis Gonzalez. Nothing in the record shows Gonzalez's citizenship status or suggests a dissolution of that marriage. Two years later Pagsisihan was released from the Illinois Department of Corrections (IDOC) on an unrelated matter and then held "for a number of months in an immigration facility." Eventually, he was released under what he describes as "an 'order of supervision.' " The United States Department of Justice, through Immigration and Naturalization Services, later granted him work authorization from July 1, 1996 to June 30, 1997.

¶ 10 Twelve years later, Pagsisihan was incarcerated in IDOC for reasons the record does not reveal. On February 9, 2009, Immigration and Customs Enforcement (ICE) issued an immigration detainer requiring IDOC to detain Pagsisihan and notify ICE at least 30 days before he was released. Two boxes checked on the form show both that "investigation has been initiated to determine whether [Pagsisihan] is subject to removal from the United States" and that "deportation or removal from the United States has been ordered."

¶ 11 About a year later, the State charged Pagsisihan with the offenses relevant to the postconviction petition we consider now: first degree murder for the 1998 shooting death of Russo and attempted first degree murder for the shooting of Vaughn. Pagsisihan agreed to plead guilty to both offenses in exchange for a 38-year sentence for first degree murder to run concurrently

with a 10-year sentence for attempted murder. The court accepted the State's factual basis for the plea and entered judgment.

¶ 12    Within 30 days of the entry of judgment, Pagsisihan filed a *pro se* motion to reduce his sentence or, in the alternative, withdraw his plea. He made only one argument—that he was unaware of the three-year term of mandatory supervised release (MSR) that he would be required to complete after his prison sentence. He asked the trial court to reduce his sentence to 35 years so that his total sentence would be 38 years after accounting for MSR. At a hearing, counsel withdrew the motion on Pagsisihan's behalf after a colloquy during which Pagsisihan informed the court that no one had promised him anything in exchange for withdrawing the motion and he understood he was forfeiting his right to file a similar motion in the future.

¶ 13    About two years later, Pagsisihan filed a *pro se* postconviction petition arguing, in part, plea counsel's ineffective assistance for failing to "investigate[ ] or ask[ ] defendant if he was a United States citizen" and failing to "inform defendant of possible deportation due to pleading guilty." The court docketed the petition and appointed counsel. Besides the immigration documents attached to the petition that established the facts recounted above, counsel attached Pagsisihan's affidavit. He averred that, to his knowledge, one of the reasons he was not deported in 1989 was that "the Philippines would not issue [him] a travel document because a birth certificate from the Philippines could not be located." He admitted signing a form in 2009 from an ICE officer alerting him that he was on "Investigation Status," but he "assumed that [he] was not subject to deportation because [he] had previously been released instead of being deported."

¶ 14    As to counsel's performance, Pagsisihan explained he told plea counsel he had dealt with immigration officials in 1995 and asked counsel to contact the Philippines consulate on his behalf.

Counsel never told him that a murder conviction would make him "subject to deportation" and never discussed his immigration status with him. After he pled guilty he "became aware that [he] was subject to deportation because of [his] conviction and learned that because of a murder conviction being an 'aggravated felony,' it would be very hard to avoid getting deported."

¶ 15     Pagsisihan's affidavit said he would not have pled guilty had he known of the immigration consequences and would have gone to trial and "sought an acquittal based on [his] innocence." He would have chosen trial because "[he] would have wanted to avoid deportation as [he] ha[s] lived in the United States since [he] was a young child, do[es] not even remember ever being in the Philippines, ha[s] children in the U.S. and other family here, and ha[s] no connection to life in the Philippines and do[es] not know anyone there."

¶ 16     The State filed a motion to dismiss arguing that plea counsel did not perform deficiently because no amount of investigation by trial counsel could have determined why Pagsisihan had not already been deported. The State argued, even if counsel had performed deficiently, no prejudice existed because "at any moment, [Pagsisihan] was deportable" and discretionary nonenforcement from the United States government did not erase his "deportable status."

¶ 17     The circuit court granted the State's motion to dismiss, finding in part: "all of these examples of interactions with the immigration system are tantamount to notice of deportation risk. The guilty plea did not create a new risk of deportation; he was already removable before the proceedings in the matter commenced." Pagsisihan filed a notice of appeal the same day.

¶ 18                                  Analysis

¶ 19     Pagsisihan argues he received ineffective assistance because plea counsel failed to advise him about the immigration consequences of his plea—mandatory, expedited deportation—and

counsel's lack of advice prejudiced him because he would have rejected a plea and risked trial had he known the immigration consequences were so dire. The State does not contest counsel's deficiency but argues Pagsisihan cannot show prejudice because (i) he was already ordered removable from the country in the 1980s and (ii) proceeding to trial would have been irrational. We agree with Pagsisihan, reverse the second-stage dismissal of his postconviction petition, and remand for an evidentiary hearing consistent with the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)).

¶ 20 The Act provides a mechanism by which criminal defendants can challenge their convictions based on alleged violations of constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). To grant relief, the circuit court must find a substantial violation of a defendant's constitutional rights. *Id.* At the second stage, the court looks only to the pleadings and must take all well-pled facts not rebutted by the record as true. *Id.* at 473. We must construe the petitioner's claims liberally; at this stage it is inappropriate to decide the credibility of the petitioner's claims. *People v. Sanders*, 2016 IL 118123, ¶¶ 31, 42. We review second-stage dismissals, like the one here, *de novo*. *Id.* ¶ 31.

¶ 21 We review a claim of ineffective assistance of counsel under the familiar standard from *Strickland v. Washington*, 466 U.S. 668 (1984), requiring a defendant to establish (i) counsel provided deficient performance that (ii) resulted in prejudice to defendant. *People v. Brown*, 2017 IL 121681, ¶ 25. The constitution's guarantee of the right to effective assistance of counsel applies to both plea and trial proceedings. *Id.* To establish prejudice in the plea context a defendant must show that " 'but for counsel's errors, he [or she] would not have pleaded guilty and would have insisted on going to trial.' " *Id.* ¶ 26 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). Claims

related to a defendant's "understanding of the consequences of pleading guilty," as opposed to matters of trial strategy, do not require a showing that the defendant would have been "better off going to trial" by raising actual innocence or a viable defense. (Internal quotation marks omitted.) *Id.* ¶ 34 (discussing *Lee*, 582 U.S. at ___, 137 S. Ct. at 1965-66). Instead, a defendant need only show that the decision to reject a plea and go to trial would be " 'rational under the circumstances.' " *Lee*, 582 U.S. at ___, 137 S. Ct. at 1968 (quoting *Padilla*, 559 U.S. at 372).

¶ 22                                 Counsel's Deficiency

¶ 23    Pagsisihan argues counsel performed deficiently because the immigration consequences of his plea were clear and there was no reasonable basis to fail to advise him about those consequences. The State does not offer an argument about deficiency in its brief and did not defend counsel's performance at oral argument. Ill. S. Ct. R. 341(h)(7), (i) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised *** on petition for rehearing."). Despite the State's forfeiture, we briefly explain our agreement with Pagsisihan because the State moved to dismiss based, in part, on lack of deficient performance by plea counsel. See *People v. Perry*, 2014 IL App (1st) 122584, ¶ 20 (our responsibility to maintain "a sound and uniform body of precedent" can outweigh considerations of forfeiture (internal quotation marks omitted)).

¶ 24    Plea counsel has a duty to inform a defendant of the immigration consequences of a plea. *People v. Valdez*, 2016 IL 119860, ¶ 16 (citing *Padilla*, 559 U.S. at 367). Counsel performs deficiently either by providing affirmative misadvice or by failing to advise at all. *Id.* Counsel's duty to advise sets in where immigration consequences are "succinct, clear, and explicit" based on express language in the Immigration and Nationality Act (INA); otherwise, counsel need only give advice of potential immigration consequences as a result of a plea. *Id.* ¶¶ 18-20.

¶ 25    Pagsisihan argues, and we agree, that the immigration consequences of a conviction for first degree murder are clear. The INA provides: "Any alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii) (2012). The INA expressly defines murder as an aggravated felony. 8 U.S.C. § 1101(a)(43)(A) (2012). Removal on the basis of the commission of an aggravated felony takes place on an expedited basis under § 1228(a)(1), and the Attorney General has no discretion to provide relief from removal if the alien is not lawfully present or is not a lawful permanent resident. 8 U.S.C. § 1228(b)(1), (b)(2)(A)-(B), (b)(5) (2012). Based on the text of the INA, we find the immigration consequences of Pagsisihan's guilty plea to be "succinct, clear, and explicit."

¶ 26    The State argued in the circuit court that counsel could not have performed deficiently because Pagsisihan was already ordered removed from the United States and counsel could not have discovered the reason he had not yet been removed through reasonable diligence. The State cited no authority for its "previously ordered removable" exception to counsel's duty to advise about immigration consequences of the *present* offense. The reason Pagsisihan had not yet been deported is beside the point; whether by grace or incompetence, he remained in the country and a guilty plea for the offense of first degree murder ensured that his deportation would be automatic, swift, and inevitable.

¶ 27    The language in *Padilla* points in this direction. The Court repeatedly spoke of the immigration consequences of a "particular offense" or a "particular plea." *Padilla*, 559 U.S. at 366, 369. The Court even parsed between the charges in a single indictment, some of which may "automatically trigger[ ] the removal consequence" and some of which may not. *Id.* at 373. Here, we know, for whatever reason, Pagsisihan's previous convictions apparently did not

"automatically trigger" his removal, but a conviction for murder does. Even though Pagsisihan's deportation was already possible, plea counsel was not absolved of her professional duty to advise Pagsisihan that deportation after *this* plea would be certain.

¶ 28                                    Prejudice

¶ 29    Pagsisihan argues he was prejudiced by counsel's failure to advise him about the immigration consequences of a first degree murder plea. His affidavit acknowledges that he had been previously ordered removable from the United States but lists several reasons, accruing over two decades, that he believed deportation was neither likely nor imminent. His affidavit also explains his connections to this country and lack of familiarity with the Philippines. The State argues, primarily, that because Pagsisihan was already removable based on his convictions from the 1980s, the immigration consequences of this plea were insignificant enough to make trial a rational choice. Based on the circumstances presented here, we disagree with the State and find Pagsisihan has made a substantial showing of prejudice.

¶ 30    We reject the State's first prejudice argument out of hand. The State claims Pagsisihan cannot establish prejudice because "he completely neglected to allege *** any legitimate claim of actual innocence or to articulate a plausible defense that could have been raised at trial." We do not judge ineffectiveness claims that are based on consequences of a conviction, as opposed to trial strategy, by that standard. *People v. Brown*, 2017 IL 121681, ¶ 34 (defendant does not have to show he or she would have been "better off going to trial" for claims "involving a defendant's understanding of the consequences of pleading guilty"). Pagsisihan did not have to allege a claim of actual innocence or a plausible defense to establish prejudice.

¶ 31    Rather, Pagsisihan's decision to reject a plea and proceed to trial need only have been rational under the circumstances. *Id.* ¶ 39. Because deportation is so severe a consequence of a criminal conviction, it can often be the paramount consideration for a noncitizen defendant. See *Lee*, 582 U.S. at ___, 137 S. Ct. at 1968. To evaluate whether a decision to reject a plea is rational in the immigration context, we consider (i) whether deportation was the "determinative issue" for an individual in plea discussions, (ii) whether the defendant has strong connections to this country and no other and (iii) whether taking a chance at trial is not "markedly harsher than pleading." *Id.* at ___, 137 S. Ct. at 1968-69. The State relies heavily on *Brown* to argue that Pagsisihan cannot show any of the three factors. But *Brown* was not an immigration case, and we find the facts alleged in Pagsisihan's petition and affidavit satisfy the test in *Lee*.

¶ 32    We briefly set out some of the facts in *Brown* because they will be relevant at each step of our analysis. There, the defendant pled guilty to the offense of armed habitual criminal, and the State voluntarily dismissed a home invasion charge. *Brown*, 2017 IL 121681, ¶ 5. The court admonished the defendant about the sentencing range for the offense and the defendant agreed that he had not been promised anything in exchange for the plea. *Id.* ¶¶ 6-7. The defendant filed a postconviction petition claiming plea counsel was ineffective for advising him that he would serve 50% of his sentence when he was required to serve 85% of his sentence. *Id.* ¶ 15. Our supreme court affirmed the circuit court's dismissal of the petition at the second stage applying the then-recent decision in *Lee*. *Id.* ¶¶ 2, 47-53.

¶ 33    The State, citing *Brown*, argues the immigration consequences of the plea could not have been Pagsisihan's paramount concern because he said nothing during the plea colloquy about those consequences and affirmatively stated that he had not been promised anything in exchange for his

plea. We find *Brown* distinguishable on this point because there the defendant alleged that plea counsel had affirmatively informed him (*i.e.,* promised him) that he would serve his sentence at 50%. *Id.* ¶ 16. This means his statement on the record during the plea colloquy that no one promised him anything in exchange for his plea effectively rebutted the claim in his petition. See *id.* ¶ 51. Pagsisihan's claim, on the other hand, is that plea counsel said nothing at all about the immigration consequences of his plea, so his affirmative response to the court's questions about not receiving any promises does not rebut his claim.

¶ 34    The State's argument also ignores the events Pagsisihan claimed took place before the plea colloquy. He averred that he informed counsel about his citizenship status and asked counsel to contact the Philippines consulate for him. Counsel said nothing about immigration in response. He also averred that he would not have pled guilty and would have risked trial, citing his family ties in the United States as the principle reason. Importantly, all the detailed evidence in *Lee* about the defendant's focus on immigration consequences came to light at an evidentiary hearing on a *habeas* petition. *Lee*, 582 U.S. at ___, 137 S. Ct. at 1963. At this stage (see *Pendleton*, 223 Ill. 2d at 473 (reciting standard of review)), we find Pagsisihan's allegations sufficient to entitle him to a similar hearing to test the credibility of his claims.

¶ 35    The State also argues that Pagsisihan's gamble on a trial would have led to "markedly harsher" results than a guilty plea. On this score, the State raises the 50 counts it voluntarily dismissed as a result of Pagsisihan's plea and the "possibility of the more severe punishment of 60 years' incarceration rather than the 38 and 10 years, respectively, that he bargained for." The parties agree Pagsisihan was sentenced before truth-in-sentencing, and so he will serve his 38-year sentence for first degree murder at 50%. We take judicial notice of the IDOC website, which shows

Pagsisihan's release from custody on December 24, 2028 (at age 62) and his discharge from his sentence on December 24, 2031 (at age 65). We acknowledge recent cases finding that consideration of good time credit is not the proper approach when determining age of release after imposing sentence. See, *e.g.*, *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 19. We need not decide the applicability of those cases here because we disagree with the State's argument on its own terms.

¶ 36    At oral argument, the State emphasized that the sentence Pagsisihan is currently serving allows for his eventual release from custody and a life of "freedom" in the Philippines compared to the *de facto* life sentence he may have received after a trial. The State cites *Brown* as authority for its comparison of the sentencing consequences after a plea versus the possible sentencing consequences after a trial. *Brown*, 2017 IL 121681, ¶¶ 49-50. In *Brown*, a side-by-side look at the available sentencing ranges was important in determining the relative "harshness" of the consequences for rejecting a plea because the defendant's claim of plea counsel's deficiency spoke directly to the length of time he would serve in prison (50% versus 85%). Here we are dealing with concerns of a different magnitude.

¶ 37    The State effectively reduces a noncitizen defendant's consideration of the incalculable human cost of deportation to a mechanical math problem where we do no more than plug in numbers and get a "rational" result. Applying that approach here would be out of step with *Lee* because it ignores the Supreme Court's recognition that deportation is a "particularly severe penalty" attending a criminal conviction and that defendants may hold their ability to remain in the United States above any possible jail sentence. *Lee*, 582 U.S. at ___, 137 S. Ct. at 1968 (quoting

*Padilla*, 559 U.S. at 365, 368). Maybe the term-of-years sentence after a trial would have been longer, but it is not the only rational consideration for a noncitizen defendant.

¶ 38    In a similar vein, the State argues that Pagsisihan "merely asserts that life in the Philippines after his release will be difficult." The State has watered down Pagsisihan's claim. His petition and accompanying documents show he has a sufficiently strong connection to the United States and none whatsoever to the Philippines.

¶ 39    Pagsisihan's mother brought him to this country when he was seven. He has no memory of the Philippines and knows no one there. Immediate family lives in the United States—according to his immigration counsel's representations at his initial removal proceedings, his mother was a lawful temporary resident, his father was a lawful permanent resident, his sister is a citizen, and Pagsisihan has a daughter who is also a citizen. Even if his parents are no longer living, or his mother's status has expired, most of his nuclear family resides in the United States on a lawful, permanent basis. The record reveals Pagsisihan is married—nothing shows a dissolution of that marriage or otherwise contradicts the information on the marriage certificate attached to his petition. Finally, as a formal legal matter, his affidavit avers he no longer has a Philippines birth certificate and the Philippines "would not issue [him] a travel document." As a matter of life and law, Pagsisihan's connections to the Philippines are nonexistent and, essentially, the United States is home.

¶ 40    We also agree with Pagsisihan that even if he received the equivalent of a life sentence after trial, he would at least be guaranteed basic human necessities like food and shelter. Returning him to a land totally foreign at an age where entering the workforce would be impracticable even in this country does not guarantee him those essential survival basics. Moreover, remaining here,

even in custody, has tangible relational benefits—at least his living family members can visit. Returning him to the Philippines, away from family, cuts off any source of familial connection forever.

¶ 41    We turn, finally, to what we consider the State's strongest argument. The State contends Pagsisihan cannot have suffered prejudice from counsel's failure to advise him about the immigration consequences of his plea because he had already been ordered removable from the United States. The circuit court reached a similar conclusion finding that Pagsisihan was not prejudiced because he "cannot say he was unaware of the risk of deportation."

¶ 42    This argument has some surface appeal; how can counsel be ineffective for failing to advise a defendant about information he already knows? But, as with the State's deficiency argument in the circuit court, the State does not cite precedent for this "already ordered removable" exception. Our own research has revealed a single appellate court decision where, as a matter of law, a defendant may never establish ineffective assistance of counsel for failure to inform a defendant about immigration consequences of a plea where the defendant already had a criminal conviction rendering him or her deportable. See *Hardware v. State*, 185 So. 3d 530, 532-35 (Fla. Dist. Ct. App. 2015) (Emas, J. specially concurring) (explaining history of rule in Florida District Court of Appeal). We reject this kind of categorical reasoning as inconsistent with *Lee* and our standard of review.

¶ 43    The Supreme Court's prejudice analysis in *Lee* started from the proposition that "categorical rules are ill suited to an inquiry" dependent on case-by-case factual evaluations. *Lee*, 582 U.S. at ___, 137 S. Ct. at 1966. The Court also emphasized that we weigh the consequences of a guilty plea versus a trial "from the defendant's perspective." *Id.* at ___, 137 S. Ct. at 1966-67.

Because we have Pagsisihan's affidavit, we know that perspective here. Pagsisihan was ordered removable after his 1985 and 1987 criminal convictions. But for 20 years, the United States did not remove him, despite having him in custody for months in 1995. He was granted work authorization the next year. In 2009, he signed a form that merely informed him that he was on "Investigation Status." At best, these signals convey a mixed message, and they are complicated by the immigration judge's express admonishment to Pagsisihan that his removal order was "not self-executing" and there may have been discretionary relief available to Pagsisihan later.

¶ 44    These factual allegations become critical in light of the Supreme Court's parting instruction in *Lee*: "We cannot agree that it would be irrational for a defendant in Lee's position to reject the plea offer in favor of a trial. But for his attorney's incompetence, Lee would have known that accepting the plea agreement would *certainly* lead to deportation. Going to trial? *Almost* certainly." (Emphases in original.) *Id.* at ___, 137 S.Ct. at 1968. Based on Pagsisihan's affidavit, the same conclusion follows. Given his two decades of on-and-off experience with immigration officials, it would be reasonable for a person in Pagsisihan's position to believe his deportation was not imminent. Contrastingly, had counsel given him proper advice, he would have known a guilty plea to first degree murder would have guaranteed his removal—as an "aggravated felon[ ]," his removal would be expedited and he would not be eligible for any discretionary relief from removal.

¶ 45    As we have repeatedly emphasized, we must take Pagsisihan's allegations as true and construe them liberally in his favor. *Sanders*, 2016 IL 118123, ¶¶ 31, 42. The trial court rejected Pagsisihan's claim on the ground that "all of these examples of interactions with the immigration system are tantamount to notice of deportation risk," implicitly contesting Pagsisihan's assertion that he "assumed that [he] was not subject to deportation because [he] had previously been released

instead of being deported." The record makes Pagsisihan's assumption facially reasonable, and the court's decision not to believe him came too soon. *Id.* ¶ 42.

¶ 46    We find that Pagsisihan demonstrated a substantial showing that his right to constitutionally effective plea counsel was violated. Perhaps "[n]ot everyone in [Pagsisihan]'s position would make the choice to reject the plea. But we cannot say it would be irrational to do so." See *Lee*, 582 U.S. at ___, 135 S. Ct. at 1969. Any additional factfinding and credibility determinations need to be made at an evidentiary hearing.

¶ 47    Reversed and remanded.

---

**No. 1-18-1017**

---

| | |
|---|---|
| **Cite as:** | *People v. Pagsisihan*, 2020 IL App (1st) 181017 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-3599; the Hon. Diane Cannon, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Hareena Meghani-Wakley, and Summer Moghamis, Assistant State's Attorneys, of counsel), for the People. |

---