2022 IL App (1st) 192294

No. 1-19-2294

Filed August 25, 2022

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 6520 |
| | ) | |
| ANTWAN ELLIOTT, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     Antwan Elliott was convicted of first degree murder for the March 15, 2015, shooting death of 16-year-old Giovanni Matos. The trial court sentenced Elliott to a prison term of 45 years plus a 25-year firearm enhancement, for a total of 70 years. Elliott appeals, arguing that (1) his trial counsel was ineffective for failing to investigate and present testimony from an expert on the unreliability of eyewitness identification and posttrial counsel was ineffective for failing to raise this issue and (2) his 70-year sentence is excessive. Regarding the first claim, he requests that we reverse his conviction and remand for a new trial. Alternatively, he requests that we reduce his

sentence to the minimum of 45 years or vacate his sentence and remand for resentencing. Finding neither of Elliott's claims to merit the relief requested, we affirm.

¶ 2                                I. BACKGROUND

¶ 3        At trial, the evidence established that Matos was shot on West Patterson Avenue in Chicago shortly before 1 p.m. on March 15, 2015, and he died as a result a few hours later.

¶ 4        Jose Figueroa testified that he was walking eastward with Matos and another friend, Henry Brito, on Patterson Avenue, a residential one-way street for westbound traffic. All three were members of the Simon City Royals (Royals) street gang. As Figueroa was speaking with his girlfriend on his cell phone, he separated and walked ahead of the other two by three house lengths. An oncoming silver Toyota Avalon automobile stopped aside Figueroa. The passenger aimed a handgun at Figueroa and asked, "Yo, what you is?" which Figueroa understood to mean his gang affiliation. Figueroa and the passenger were approximately 10 feet apart, and Figueroa could see the passenger's face. Figueroa ignored the inquiry and continued walking. The Toyota moved toward Matos and Brito. Figueroa warned them to "watch the car." The passenger put the same question regarding gang affiliation to Matos and Brito. In response, Matos began "throwing signs" indicative of the Royals. The passenger exited the Toyota and commenced firing the handgun. Figueroa, Matos, and Brito ran in different directions. Figueroa returned to the area after the shooting stopped and the Toyota had driven away. Figueroa found Matos lying in the street, bleeding from a gunshot wound.

¶ 5        Figueroa remained at the scene and spoke with a Chicago police detective. He informed the detective that the shooter was "B-Boy," a former member of the Latin Brothers street gang who had "flipped" to the Milwaukee Kings street gang. As a Milwaukee King, he was known by the nicknames "Boosie" and "Capone." The Milwaukee Kings, according to Figueroa, were rivals

of the Royals. Figueroa accompanied the detective to a police station later that day. While there, he identified Elliott, whom he knew as B-Boy and Capone, in a photo array as the shooter. Figueroa identified Elliott in court as the same person he identified in the photo array.

¶ 6     On cross-examination, Figueroa compared the distance between him and the Toyota to the distance from the witness stand to a person in the courtroom: he estimated that distance was 15 feet. Regarding the photo array he viewed, Figueroa testified he was shown each photo sequentially, not all six at once. The photo of Elliott was presented first and was labeled "No. 1." Figueroa agreed with counsel that the other individuals depicted in the array had characteristics that differed from Elliott, including one with dreadlock style hair, two with mustaches and beards, and another with a "very high forehead." Figueroa answered that he had not been friends with Elliott before the shooting and did not associate with him. He then admitted that he told an assistant state's attorney (ASA) in an interview eight days after the shooting that he had been friends with Elliott. Figueroa explained that he knew of Elliott from socializing with members of the Latin Brothers. Regarding the shooting, Figueroa testified that the shooter was standing on the sidewalk and exchanged gang banter with Matos and Brito for two minutes before he commenced firing. When asked about the scene, Figueroa testified that there were vehicles parked on the street but there was no moving vehicle behind the Toyota. Figueroa affirmed that he told investigating officers at the scene that the shooter was "B-Boy."

¶ 7     On redirect, Figueroa testified that his brother had been a member of the Latin Brothers and he observed Elliott when socializing with members of that gang.

¶ 8     Tiffany Jureczak testified that on March 15, 2015, she had been driving westbound on West Patterson Avenue with her 7-year-old son seated in the rear. A vehicle stopped in front of her and pulled to the side but still prevented her from passing on the narrow street with vehicles parked on

both sides. Jureczak observed a person standing next to the stopped vehicle yelling at three "kids" on the sidewalk. Anticipating that a fight would ensue, she turned to her son and told him to look away. Jureczak looked forward again and observed that the person who had exited the vehicle was now firing a handgun. The "boys" on the sidewalk scattered. One ran into the street and fell upon being shot. Jureczak checked on her son once more. She turned back and viewed the shooter standing in the street with a firearm in his hand, looking in her direction. He was wearing a baseball cap, but Jureczak was able to see his face as they made eye contact for a few seconds. Jureczak then held her body over her son. When she next viewed the scene, the shooter and stopped vehicle were gone. Seven days after the shooting, Jureczak viewed a lineup and identified Elliott as the shooter. She also identified Elliott in a photograph during her grand jury testimony on April 3, 2015. Jureczak identified Elliott again in court as the person she made eye contact with on March 15, 2015. At trial, she identified a photograph of the earlier lineup with Elliott positioned second from the right. Jureczak identified a photograph of the scene on West Patterson Avenue as well, pointing out the location where she had stopped her vehicle.

¶ 9        On cross-examination, Jureczak explained that she had stopped about two car lengths behind the stopped vehicle. She clarified that she did not observe the gunshots until she looked forward after telling her son to look away. Jureczak testified that she had exited her vehicle intending to ask the driver of the stopped vehicle to allow her to pass but returned inside before the shooting began.

¶ 10        Lucia Ferraro testified that she lived with her husband and their two sons on the 5800 block of West Patterson Avenue in 2015. Shortly before 1 p.m. on March 15, the family was preparing to travel to her mother's house. After securing her sons in the back seat and entering their vehicle, Ferraro observed three "kids" walking in her direction on the sidewalk. One was talking on a cell

phone and walking a short distance ahead of the other two. Her husband then entered the driver's seat and exclaimed, "Get down! Someone's got a gun!" Ferraro looked forward and observed an African American male standing in the parkway, firing a handgun. One of the kids from the sidewalk ran in front of their vehicle and was struck by a bullet. Ferraro ducked below the dashboard and heard three or four shots and "thump" sounds on their vehicle. Once the shooting stopped, Ferraro looked up and observed the shooter enter a vehicle, which then sped away. According to her, he was wearing black jeans and a dark colored hooded sweatshirt with the hood pulled over his head. Frightened by the shooting, the family exited their vehicle and sought refuge inside their home. Ferraro returned to the street and found the young man who had been shot lying in the street, just feet from their vehicle. She called 911. Ferraro saw the shooter's front side, but she was unsure whether she saw his face. She explained that her attention had been focused on the silver colored handgun in his hands.

¶ 11     On cross-examination, Ferraro testified that she did not know whether there were any other vehicles, apart from parked cars, on the street since, prior to the shooting, she had been focused on getting her children into their vehicle and, after the shooting, she was focused on getting them to safety. She was also unsure whether the shooter was wearing a hat. Ferraro did not observe whether the kids walking on the sidewalk had spoken with the shooter.

¶ 12     Detective John Salemme testified that he responded to the scene on Patterson Avenue. There, he found Jose Figueroa seated inside of a squad car with Henry Brito outside. After separating the two, Figueroa told Detective Salemme the shooter was known by the nicknames "B-Boy" and "Capone" and was a former Latin Brother who was now a Milwaukee King. Using that information, Detective Salemme generated a photo array that included Elliott. Another detective, Mark Dimeo, administered the array with Figueroa at a police station.

¶ 13        On cross-examination, Detective Salemme explained that a computer program supplies other photos for an array using demographic information. Detective Salemme testified that Figueroa did not tell him that the shooter previously showed him a handgun while asking "what you is?" from the passenger seat. Nor did Figueroa relate that the shooter had a two-minute-long argument with Matos and Brito.

¶ 14        Investigators recovered seven .40-caliber cartridge cases in the vicinity of the shooting. Analysis indicated that all seven were fired from the same semiautomatic handgun.

¶ 15        Medical testimony indicated that Matos was killed by a single gunshot wound that struck him in the back of his head.

¶ 16        Detective Ruben Weber testified that he learned Elliott had been arrested on March 21, 2015. Detective Weber took custody of a cell phone that was found in Elliott's possession and had it sent to the Chicago Regional Forensics Lab for analysis. Based on his knowledge of street gang terminology, "opp" means a rival gang member and "banger" means a handgun.

¶ 17        Chicago police officer Donald Frugoli testified that he extracted data from the cell phone found in Elliott's possession. Some features on the phone contained labels that included the name "Antwan." The day before Matos was shot, the phone sent a message to "Little Rick" inquiring about "40 shells." Later that day, the Facebook user "LA Capone" sent a responsive message to "Dreadhead Brian" stating that he "put[s] in work" for the Milwaukee Kings.

¶ 18        At 2:30 p.m. on March 15—the afternoon of the shooting—the phone received a text message asking where Elliott was. The user of the phone indicated he was "stashed" in a little room due to an "emergency." A later message from "Moises" asked, "U got it on u?" The user replied, "Yeah." Moises responded that he would be there in 10 minutes.

¶ 19    Also on March 15, the phone was used for web searches of "shooting on Menard Patterson," "Chicago shooting on Menard and Patterson," and "killed on NW side of Chicago." That evening, the phone sent a Chicago Tribune website article about the shooting to "Pat." The phone user also searched Facebook and the web for "Giovanni Matos" and "Gio Matos." Around 8:30 p.m., the phone was used to message "Gucci" saying, "Royal down."

¶ 20    On March 16, the phone received a message reading in part, "Im trynna hunt some opps down lemme me hold banger." The phone user responded, "You can't Folkz you need somebody with you ain't no dues in for you." A few days later, the phone received a message asking, "what's up with the Royals?" to which the user responded, "we Royal killa."

¶ 21    Later, on March 20, a Facebook user asked LA Capone whether he used to be an "LB." LA Capone confirmed that he had been and was called "B-Boy." In an exchange of messages, LA Capone explained why he "flipped" to "MKZ."

¶ 22    The defense presented a stipulation that Figueroa did not state that the passenger of the Toyota displayed a handgun when Figueroa spoke with an ASA on March 23, 2015.

¶ 23    In closing argument, defense counsel posited that Ferraro was the most credible witness and her inability to identify the shooter undermined whether Figueroa or Jureczak—who similarly experienced the stress of the chaotic event—could. Counsel suggested Figueroa was not paying adequate attention as he admitted that he had been talking to his girlfriend while he walked along Patterson Avenue and had taken off running when the shooting started. Counsel further suggested that Figueroa fabricated that the passenger pointed a gun at him since he did not relate that to the detective and ASA. Figueroa also gave differing statements about whether he had been friends with Elliott prior to the shooting. More, counsel insisted that Figueroa had "an axe to grind" as he was a Royal and Elliott was a rival Milwaukee King. For Figueroa, counsel proposed one

Milwaukee King "is as good as any other" and Figueroa had time to speak with other gang members to discuss someone to name before he spoke with police. Counsel further stated that presenting Elliott's photo first in the sequence shown to Figueroa was "weird."

¶ 24    Similarly, counsel argued that Jureczak's identification was unreliable. She was looking back at her child and, despite testifying that she made eye contact with the shooter, gave no description of his face.

¶ 25    Additionally, counsel noted discrepancies in the witnesses' accounts. Ferraro testified that the shooter was standing in the parkway while Figueroa put him on the sidewalk and Jureczak said he was in the street. Jureczak testified she was a short distance behind the shooter's vehicle, but neither Figueroa nor Ferraro noticed any other vehicles aside from those parked along Patterson. Ferraro testified the shooter wore a hooded sweatshirt while Jureczak testified he wore a hat.

¶ 26    Regarding the material obtained from Elliott's cell phone, counsel argued that it was taken out of context to fit the narrative of the State's theory of the case.

¶ 27    The jury found Elliott guilty of first degree murder. Trial counsel filed a motion for new trial, arguing, *inter alia*, that the content admitted from Elliott's phone was prejudicial and Jureczak's identification was unreliable. New counsel entered an appearance on behalf of Elliott, and prior trial counsel was permitted to withdraw. Posttrial counsel adopted the previously filed motion for new trial, which the trial court denied.

¶ 28    At sentencing, the state presented evidence regarding a 2013 incident in which Elliott pointed a handgun at a person. The state also presented evidence regarding Elliott's prior conviction for aggravated unlawful use of a weapon (AUUW). When arrested on March 21, 2015, Elliott was found to illegally possess a .40-caliber handgun.[1] The state further presented photos

---

[1] Analysis showed that this handgun was not the same .40-caliber handgun used in the Matos shooting.

from Elliott's Facebook page depicting him with handguns and gang-related symbols or captions. Ultimately, the State asked the court to impose a "close to life" sentence.

¶ 29    Defense counsel urged the court to impose the minimum sentence, which would offer Elliott the ability to "restore himself to a useful position in society." Pointing to information in the presentence investigation report (PSI), counsel noted that Elliott lost both of his parents at a young age and had been "consumed" by the streets and gangs. Counsel reiterated that Elliott told the PSI investigator that he took no pride in his behavior and expressed concern for other people. In allocution, Elliott told Matos's family, "Sorry for your loss."

¶ 30    The court stated that it had reviewed the PSI and considered the arguments of the parties. The court noted Elliott's prior AUUW conviction and recited information regarding his upbringing, commenting that Elliott was "never abused, not neglected" and "all of his needs were met." Rebuking Elliott's statement that he took no pride in his criminal behavior, the court remarked that it found the evidence to show that "Elliott took ghoulish pride in his behavior." The court went on to observe that Matos was "[a] 16-year-old kid walking down the street" and Elliott shot him "for no reason whatsoever except" being an opposing gang member that gave the "wrong answer" to Elliott's question.

¶ 31    The court sentenced Elliott to a term of 45 years plus a 25-year mandatory firearm enhancement, for a total of 70 years. Elliott filed a motion to reconsider the sentence asserting, *inter alia*, that the sentence was excessive given his background. The court denied the motion to reconsider sentence at a subsequent hearing. A timely notice of appeal followed.

¶ 32                                II. ANALYSIS

¶ 33                        A. Failure to Present Expert Testimony

¶ 34        Elliott first argues that his trial counsel was ineffective for failing to investigate and present expert testimony on the reliability of eyewitness identification to support the theory that he was misidentified as the person who shot Matos. Specifically, he contends that such expert testimony would have given the jury reason to determine Jureczak's identification was unreliable. In addition, Elliott contends his posttrial counsel was ineffective for failing to include this issue in the motion for new trial.

¶ 35        Before addressing the merits of this issue, we examine the State's argument that Elliott has forfeited this claim since he had new counsel after trial who could have, but failed to, raise this issue in a motion for new trial. To support that those circumstances constitute forfeiture of an issue, the State cites *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 136, and *People v. Salgado*, 366 Ill. App. 3d 596, 607 (2006), in which panels of this court found that defendants had forfeited ineffectiveness claims for direct appeal when they were represented by different counsel in posttrial proceedings. In *Fretch* and *Salgado*, each defendant attempted to raise a specific ineffectiveness claim on direct appeal that was not raised but was closely related to an issue included in the motion for new trial filed by new posttrial counsel. Elliott's posttrial counsel, by contrast, did not include any issues closely related to the issue he raises on appeal. Therefore, this case is distinguishable from *Fretch* and *Salgado*. In addition, Elliott raised his posttrial counsel's ineffectiveness with respect to this issue in his opening brief, which neither of the defendants in *Fretch* and *Salgado* had done. Thus, the issue is reviewable, as Illinois courts have recognized that posttrial counsel's failure to raise issues of trial counsel's ineffectiveness could constitute a claim of posttrial counsel's ineffective assistance. See, *e.g.*, *People v. Towns*, 182 Ill. 2d 491, 523-24 (1998) (noting that posttrial counsel's failure to challenge trial counsel's competency could have prejudiced the defendant if trial counsel was found to have been ineffective). Further, forfeiture is

a limitation on the parties, not the reviewing court. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. So, even if the issue was forfeited, "we may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent." *Id.* We find this to be such a case, as eyewitness identification was significant to the conviction and the issue is Elliott's sole contention on appeal apart from a sentencing issue. Additionally, Elliott's trial took place after our supreme court's decision in *People v. Lerma*, 2016 IL 118496, which shifted the law in favor of the admission of such expert testimony. Other defendants who have raised similar claims were tried before the *Lerma* decision, and their ineffectiveness claims could not overcome the principle that counsel's competence could only be judged by the law in place at the time and not subsequent developments. See, *e.g.*, *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 39; *People v. Navarro*, 2021 IL App (1st) 190483, ¶ 16. Since Elliott's trial occurred after *Lerma* was decided, that principle is not implicated. In our research, we found no reported case where a defendant tried after the *Lerma* decision raised a similar ineffectiveness claim on direct appeal. For these reasons, we will review whether Elliott's trial counsel[2] was ineffective for failing to present expert testimony on the reliability of eyewitness identification.

¶ 36    To prevail on an ineffective assistance claim, a defendant must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Peterson*, 2017 IL 120331, ¶ 79. That is, a defendant must show that (1) their attorney's performance fell below an objective standard of reasonableness and (2) the defendant was prejudiced by their attorney's deficient performance. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 51. The failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *Id.*

---

[2]The record shows that Elliott was represented by a team of three Assistant Public Defenders at trial. We refer to them collectively as "counsel."

¶ 37      For the first prong, a defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction was sound trial strategy. *Id.* Decisions regarding which evidence to present and which witnesses to call are matters of trial strategy. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38. Such decisions will not ordinarily support a claim of ineffective assistance of counsel. *Peterson*, 2017 IL 120331, ¶ 80. Thus, to prevail on a claim based on a matter of trial strategy, a defendant must establish that counsel's strategy was so unsound that counsel entirely failed to conduct meaningful adversarial testing of the State's case. *Id.*

¶ 38      Elliott argues that counsel's challenged actions here cannot be regarded as trial strategy since counsel "did not even investigate the possibility of an eyewitness expert to testify about the unreliability of the eyewitnesses' identifications in his case." He relies on the proposition that counsel's decisions can only be regarded as strategic if made after a thorough investigation. See, *e.g.*, *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 39 ("strategic decisions may be made only after there has been a thorough investigation of law and facts relevant to plausible options" (internal quotation marks omitted)). To be sure, trial counsel has a professional duty to conduct reasonable investigations. *People v. Domagala*, 2013 IL 113688, ¶ 38. Elliott fails, however, to identify any portion of the record indicating that, in fact, trial counsel did not investigate the possibility of expert testimony. Rather, he asks us to presume that counsel failed to conduct such an investigation merely from the fact that counsel never sought to introduce eyewitness expert testimony at trial. We cannot so presume. Much the opposite: Elliott has the burden to overcome the strong presumption that counsel's decision not to present expert testimony was the result of considered trial strategy. *Kindle*, 2021 IL App (1st) 190484, ¶ 51. Since nothing in the record demonstrates that it was not, Elliott has failed to overcome that presumption. Accordingly, we must treat counsel's decision not to present expert testimony as a matter of trial strategy.

¶ 39     Nevertheless, even if we assume *arguendo* that counsel failed to investigate the possibility of expert testimony, we cannot conclude that it was objectively unreasonable to forgo such an investigation. "Where circumstances known to counsel at the time do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation." *Williams*, 2017 IL App (1st) 152021, ¶ 38. Counsel may "make a reasonable decision that makes particular investigations unnecessary." *Id.* (citing *People v. Pecoraro*, 175 Ill. 2d 294, 324-25 (1997)). "Lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, applying a heavy measure of deference to counsel's judgments." (Internal quotation marks omitted.) *People v. Kokoraleis*, 159 Ill. 2d 325, 330 (1994).

¶ 40     The admission of expert testimony is within the trial court's discretion (*People v. Becker*, 239 Ill. 2d 215, 234 (2010)), and therefore, even if counsel had sought to elicit expert testimony, it may not have necessarily been admitted. "[I]n the exercise of its discretion, the trial court should carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration." *People v. King*, 2020 IL 123926, ¶ 35.

¶ 41     In *Lerma*, our supreme court recognized that research concerning eyewitness identifications was "well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Lerma*, 2016 IL 118496, ¶ 24. In assessing the relevance and appropriateness of the expert testimony, our supreme court identified four factors to be considered: (1) the importance of the eyewitness identifications to the State's case, (2) whether the factors identified by the expert as undermining the reliability of eyewitness identifications were present in the case, (3) whether the eyewitnesses were available for cross-examination, and (4) the

eyewitnesses' prior familiarity with the suspect. *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 33 (citing *Lerma*, 2016 IL 118496, ¶ 26).

¶ 42        In *Lerma*, each of these factors weighed in favor of admitting the expert testimony. The State's case relied "100% on the reliability of its eyewitness identifications." *Lerma*, 2016 IL 118496, ¶ 26. Several factors the proffered experts pointed out contributed to the unreliability of the witnesses' identifications: a stressful event, the presence of a weapon, a partial disguise, exposure to postevent information, and that the shooting occurred at night. *Id.* One identification was admitted as an excited utterance of a deceased victim who, of course, could not be cross-examined. *Id.* The other eyewitness had only minimal familiarity with the defendant prior to the shooting. *Id.* Thus, the court found that there was "no question" that *Lerma* was the "type of case for which expert eyewitness testimony is both relevant and appropriate." *Id.*

¶ 43        Similarly, in *People v. Hayes*, 2022 IL App (1st) 190881-B, a panel of this court found that a defendant demonstrated arguable prejudice resulting from counsel's failure to present expert eyewitness testimony to warrant further postconviction proceedings on his claim of ineffective assistance. In *Hayes*, six eyewitnesses identified the defendant as the perpetrator of a shooting. *Id.* ¶¶ 7, 11. However, each witness only saw the shooter for a brief time, and the shooting occurred at night. *Id.* ¶¶ 7, 47. Their descriptions of the shooter varied, and four of the witnesses described seeing the offender holding a firearm. *Id.* ¶¶ 8, 10. No other evidence connected the defendant to the shooting, and he presented two witnesses who corroborated his alibi testimony that he was attending a party. *Id.* ¶ 12. The court found that expert eyewitness testimony could have arguably led to a different result at trial. *Id.* ¶ 47. Since there were weaknesses in the witnesses' identifications, and the defendant presented a competing narrative, expert testimony regarding weapon focus and overconfidence could have at least arguably made a difference. *Id.* ¶ 50.

¶ 44       This case is distinguishable from *Lerma* and *Hayes*. Unlike the nighttime shootings in those cases, this one occurred in broad daylight, and one witness, Figueroa, was familiar with Elliott. The testifying witness in *Lerma* had only a "minimal level of familiarity with the defendant prior to the offense." *Ortiz*, 2017 IL App (1st) 142559, ¶ 33. But Figueroa was far more familiar with Elliott, recognizing him from socializing with the Latin Brothers and knowing Elliott's nicknames, B-Boy and Capone. The material discovered on the phone found in Elliott's possession seemed to confirm that he went by Capone and, in one conversation, stated that he was called B-Boy when he was a Latin Brother. Even more, his messages and Internet searches could be reasonably construed to implicate him in the shooting. His messages indicated that he was trying to obtain .40-caliber bullets the day before the shooting. His internet searches showed he had a keen interest in finding news reports about the shooting after it happened. Moreover, in messages sent to what appear to be fellow Milwaukee King gang members following the shooting, Elliott seemed to obliquely take credit for it. Thus, the case against Elliott did not rely "100%" on eyewitness identification. Also differing from *Lerma*, both eyewitnesses were available for cross-examination. For these reasons, the factors identified in *Lerma* do not weigh in favor of the admissibility of eyewitness expert testimony. As a result, Elliott's trial counsel could have reasonably predicted that the trial court would not determine Elliott's case to be the "type of case for which expert eyewitness testimony [was] both relevant and appropriate" (*Lerma*, 2016 IL 118496, ¶ 26) and, therefore, made a reasonable decision not to pursue expert testimony.

¶ 45       Another reason counsel could have reasonably decided against consulting an eyewitness identification expert is that, by calling such an expert, the State would have been permitted to call its own expert whose testimony may have bolstered the accuracy of Jureczak's identification. *Macklin*, 2019 IL App (1st) 161165, ¶ 39. To be certain, some factors eyewitness experts have

identified as affecting the accuracy of an identification weigh in favor of the reliability of Jureczak's positive identification of Elliott. See *Lerma*, 2016 IL 118496, ¶¶ 8, 26 (listing such factors). She viewed the shooter in daylight. His face was not obscured. She identified Elliott as the shooter only seven days after the event. Nothing indicated that Jureczak was exposed to any postevent information pointing to Elliott. And the record does not support that the lineup was unduly suggestive.

¶ 46    Importantly, this court has observed that *Lerma* does not support the conclusion that trial counsel is necessarily ineffective for not presenting eyewitness expert testimony in any case where the State relies on eyewitness identification of the defendant. *Macklin*, 2019 IL App (1st) 161165, ¶ 39. *Lerma* concerned only whether the trial court abused its discretion to exclude expert eyewitness testimony that counsel had sought to introduce at trial. *Lerma* did not concern an ineffective assistance claim. This court has noted that counsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger. *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). Thus, even in an "appropriate" case for expert testimony on eyewitness identification, counsel is not necessarily ineffective for choosing not to present such testimony. Rather, as noted, this is a matter of trial strategy, and we will only find counsel ineffective if counsel failed to subject the State's case to meaningful adversarial testing. *Peterson*, 2017 IL 120331, ¶ 80; *People v. West*, 187 Ill. 2d 418, 433 (1999).

¶ 47    Here, we cannot conclude that counsel failed to subject the State's case to meaningful adversarial testing. Through opening and closing statements and cross-examination, counsel challenged the credibility of Figueroa's identification of Elliott. He highlighted that Figueroa had been paying attention to his cell phone during his encounter with the Toyota passenger; had his back to the shooter; had an opportunity to speak with friends, including fellow gang members,

before he spoke with police; and had motive to falsely name Elliott as the shooter out of gang rivalry. Counsel likewise challenged Jureczak's identification of Elliott by noting that her attention was distracted as she continually turned to check on her son; her description differed from Ferraro's, who could not identify the shooter and viewed the event under similar circumstances; and neither Figueroa nor Ferraro testified that they had seen Jureczak's vehicle behind the shooter's. In our review of the record, we cannot conclude that counsel's chosen trial strategy was so unsound that it entirely failed to conduct any meaningful adversarial testing. The right to effective assistance of counsel refers to " 'competent, not perfect representation.' " *West*, 187 Ill. 2d at 432 (quoting *People v. Stewart*, 104 Ill. 2d 463, 492 (1984)). Counsel's strategic choices should not be viewed in hindsight and "the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *People v. Fuller*, 205 Ill. 2d 308, 331 (2005). We would have to violate these principles to conclude that Elliott's attorney's performance was so inadequate that he was "not functioning as the 'counsel' guaranteed by the sixth amendment." (Internal quotation marks omitted.) *People v. Dupree*, 2018 IL 122307, ¶ 44 (stating that the deficiency prong of *Strickland* requires a defendant to show that his counsel's performance was so inadequate that counsel was not functioning as the counsel guaranteed by the sixth amendment). Accordingly, we find that Elliott has not demonstrated that his counsel's performance was deficient.

¶ 48     Additionally, we observe that Elliott's claim of prejudice resulting from his trial counsel's failure to present eyewitness expert testimony is speculative. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice."). His ineffectiveness claim focuses solely on Jureczak's identification. Elliott asserts

that an expert witness could have led the jury to find Jureczak's identification testimony unreliable. Specifically, he submits that an expert would testify regarding (1) the low correlation between a witnesses' confidence in an identification and the accuracy of their identification, (2) the effect of the presence of a weapon, (3) the effect of a stressful situation, and (4) the weakness of identifying a stranger. Citing cases that note scientific studies supporting these points, Elliott contends these factors all militate against the reliability of Jureczak's identification and, had an eyewitness expert testified, there would have been a reasonable probability of acquittal.

¶ 49   This is far too speculative to establish prejudice under *Strickland*. First, as no expert testimony was proffered, such testimony is necessarily speculative. See *People v. Johnson*, 2021 IL 126291, ¶ 58 ("speculation as to what an expert would say is insufficient to establish prejudice" (citing *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001)). Second, as we noted, the State would have been permitted to call its own expert whose testimony may have bolstered the accuracy of Jureczak's identification. *Macklin*, 2019 IL App (1st) 161165, ¶ 39. Lastly, Jureczak's identification was not the sole evidence against Elliott. His claim of prejudice requires us to assume that not only would the jury have found her identification unreliable, but that the jury would also find that Figueroa was incredible—identifying Elliott solely out of gang rivalry and that the content found on Elliott's phone showed his mere curiosity about the shooting and banter among fellow gang members. We cannot speculate this much.

¶ 50   For these reasons, we reject Elliott's claim that his trial counsel rendered ineffective assistance in failing to present expert testimony on the reliability of eyewitness identification. Likewise, we reject that posttrial counsel was ineffective for failing to include this issue in a motion for new trial.

¶ 51                               B. *De Facto* Life Sentence

¶ 52          Next, Elliott argues that his 70-year prison term is excessive. In so arguing, his brief relies on assertions that would render a sentence unconstitutional while also asserting that the trial court abused its discretion. Those are separate, distinct issues. Elliott fails to specify whether he is making a constitutional challenge to his sentence or simply claiming that the trial court abused its discretion. We note that the failure to clearly disaggregate issues does not technically violate Illinois Supreme Court rules but is disfavored, as such argumentation complicates our review. See *People v. Hardy*, 2020 IL App (1st) 172485, ¶ 72 (admonishing appellant for similarly conflating three distinct sentencing arguments). We construe Elliott's sentencing argument as asserting both an as-applied constitutional challenge and an alternate claim that the court abused its discretion.

¶ 53          We address the constitutional issue first. Unlike an abuse of discretion challenge to a sentence, an as-applied constitutional challenge is a legal question that we review *de novo*. *People v. Vega*, 2018 IL App (1st) 160619, ¶ 52. The chief assertion of Elliott's claim is that his 70-year prison term amounts to a *de facto* life sentence that requires him to live to age 90 to be released. As such, Elliott contends that the sentence offers him "no hope of an eventual rehabilitation into society." A *de facto* life sentence is a term of years that is functionally equivalent to natural life without the possibility of parole. *People v. Reyes*, 2016 IL 119271, ¶ 9. Our supreme court has held that such a sentence violates the eighth amendment's prohibition on cruel and unusual punishment when imposed on a juvenile without consideration of youth and its attendant mitigating factors. *Id.* The court later resolved that "a prison sentence of 40 years or less imposed on a juvenile offender provides some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (Internal quotation marks omitted.) *People v. Buffer*, 2019 IL 122327, ¶ 41. Accordingly, "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." *Id.*

¶ 54    The *de facto* life sentence concept stems from the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460, 472 (2012), which held that a mandatory term of life without the possibility of parole may not be applied to a juvenile. In *Miller*, the Court recognized that "children are constitutionally different from adults for purposes of sentencing" (*id.* at 471) and the eighth amendment requires that judges be afforded discretion to consider youth and its attendant mitigating circumstances when sentencing a juvenile. *Id.* at 476, 489.

¶ 55    Elliott, at 20 years old, was a young adult and not a juvenile at the time of his offense. *Miller*'s eighth amendment protection does not extend to adults. *People v. Harris*, 2018 IL 121932, ¶ 61. Nevertheless, our supreme court has left open the possibility that the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) may provide *Miller*-like protections as applied to a young adult (over age 18 at the time of their offense) who can demonstrate "how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to [their] specific facts and circumstances." *Harris*, 2018 IL 121932, ¶ 46. Generally, the evidentiary record must be sufficiently developed in the trial court before a reviewing court can resolve this question for a young adult offender. *Id.* (finding the record insufficient to decide such an as-applied proportionate penalties challenge); see also *People v. House*, 2021 IL 125124, ¶ 31 (same). Elliott likewise did not raise this specific issue before the trial court nor did he present evidence to support that the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to his specific facts and circumstances.

¶ 56    However, we can resolve Elliott's claim on the existing record since *Miller* does not apply to his specific facts and circumstances, as he is not subject to a *de facto* life without the possibility of parole sentence. To the contrary, Elliott is eligible for parole. Our legislature has provided that:

"A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 (the effective date of Public Act 100-1182) shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences." 730 ILCS 5/5-4.5-115(b) (West 2020).

Elliott committed first degree murder on March 15, 2015. The record contains several documents that report Elliott's date of birth as March 16, 1994. The Illinois Department of Corrections (IDOC) website states the same. *People v. Pagsisihan*, 2020 IL App (1st) 181017, ¶ 35 (noting that we may take judicial notice of information pertaining to a defendant on the IDOC website). Accordingly, Elliot was under 21 years of age on the date of the offense. He turned 21 the following day. Elliott was sentenced on September 23, 2019—after the effective date of the Act making such persons eligible for parole. Thus, Elliott meets the criteria to be eligible for parole review after serving 20 years of his sentence. His claim that his sentence requires him to be imprisoned until age 90 is false. Rather, with eligibility for parole, Elliott may obtain release upon demonstrated rehabilitation and maturity upon serving 40 or fewer years. *Buffer*, 2019 IL 122327, ¶ 41; *People v. Dorsey*, 2021 IL 123010, ¶ 54 (noting that courts look to the earliest opportunity for release to assess whether a *de facto* life sentence has been imposed); see also *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016) (observing that consideration for parole remedies any *Miller* violation). This court has observed that the opportunity for release after 40 or fewer years is "the only relevant consideration" as to whether a sentence implicates *Miller*. *People v. Brakes*, 2021 IL App (1st) 181737, ¶ 34. Elliott's sentence simply does not implicate *Miller*. It is not a *de facto* life sentence since he is eligible for parole. To be sure, our legislature's 2019 enactment providing parole eligibility for offenders under age 21 convicted of serious crimes seems to have been a remedial response to the constitutional issues recognized in *Miller* for both juveniles and young adults.

(Parole was eliminated in favor of determinate sentencing in 1978. See *Johnson v. Granzen*, 77 Ill. 2d 513, 516 (1979) (reviewing statutory history of 1978 amendments to Illinois's sentencing scheme). For these reasons, an as-applied constitutional challenge based on *Miller* necessarily fails for Elliott.

¶ 57     We turn to whether the trial court abused its discretion in sentencing Elliott to a term of 70 years. The circuit court has " 'broad discretionary powers' " to determine the appropriate sentence, and we afford " 'great deference' " to the circuit court's sentencing decision since " 'the trial court is generally in a better position than the reviewing court to determine the appropriate sentence.' " *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 136 (quoting *People v. Stacey*, 193 Ill. 2d 203, 209 (2000)). Thus, we will not substitute our judgment for that of the trial court merely because we would have weighed relevant factors differently. *Id.* ¶ 137 (citing *People v. Alexander*, 239 Ill. 2d 205, 212 (2010)). A reviewing court may not alter a defendant's sentence absent an abuse of discretion. *Alexander*, 239 Ill. 2d at 212. "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *Stacey*, 193 Ill. 2d at 210).

¶ 58     Elliott argues that the trial court abused its discretion by failing to adequately consider mitigating factors, primarily his age and potential for rehabilitation. He contends that proper consideration of these factors renders his 70-year sentence excessive and warrants reduction to the minimum sentence of 45 years. We disagree. "The phrase 'excessive sentence' is reserved for a sentence within the statutory range but without regard for a particular defendant's rehabilitative potential." (Internal quotation marks omitted.) *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 71. In our review, we cannot conclude that the trial court gave no regard to Elliott's rehabilitative potential. Rather, in its discretion, the court determined that 70 years was the appropriate sentence

when considering both the seriousness of the offense and Elliott's rehabilitative potential. " '[A] defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense.' " *Alexander*, 239 Ill. 2d at 214 (quoting *People v. Coleman*, 166 Ill. 2d 247, 261 (1995)). Again, we will not reweigh these factors and substitute our judgment for that of the trial court. Elliott's argument essentially asks us to do just that.

¶ 59    As with the constitutional issue, we find that Elliott's eligibility for parole is relevant. As noted, our legislature eliminated parole for offenses occurring on or after February 1, 1978, when Illinois instituted determinate sentencing. For that reason, it has been several decades since eligibility for parole has factored into our review of criminal sentences. Decisions predating the 1978 changes indicate that this court has found eligibility for parole to be a proper factor to consider when determining whether a sentence is excessive. See, *e.g.*, *People v. Peter*, 43 Ill. App. 3d 1068, 1071 (1976) (finding that a defendant convicted of murder sentenced to an indeterminate term of 90 to 180 years in prison was not excessive since he was eligible for parole upon serving 20 years). Accordingly, we find that Elliott's eligibility for parole militates against finding his sentence excessive, greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. Our decision should not be read as holding that no sentence could be found excessive if a defendant is eligible for parole. Rather, since Elliott argues that his sentence is excessive for reasons that parallel a *Miller*-type claim, we find that Elliott's sentence is not excessive, and the trial court did not abuse its discretion in sentencing him to a term of 70 years under the facts and circumstances of this case.

¶ 60                                    III. CONCLUSION

¶ 61    Based on the foregoing, we find that Elliott has failed to demonstrate that he received ineffective assistance of trial or posttrial counsel and that his sentence is not excessive. Accordingly, we affirm the conviction and sentence.

¶ 62    Affirmed.

***People v. Elliott*, 2022 IL App (1st) 192294**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-6520; the Hon. Stanley J. Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Brian W. Carroll, and Beverly M. Jones, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian K. Hodes, and Susan Wobbekind, Assistant State's Attorneys, of counsel), for the People. |