2025 IL App (1st) 231825-U

No. 1-23-1825

August 12, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 8100 |
| | ) | |
| ROBERT DOWNEY, | ) | Honorable |
| | ) | Paul Pavlus, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

ORDER

¶ 1    *Held*:  We affirm the second-stage dismissal of defendant's petition for postconviction relief where he failed to show that he received unreasonable assistance of postconviction counsel.

¶ 2    Defendant Robert Downey appeals from the second-stage dismissal of his petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, he asserts that postconviction counsel provided unreasonable assistance by failing to

support the claim that trial counsel was ineffective for not using a 911 call that supported defendant's self-defense theory. We affirm.

¶ 3    Following a bench trial, defendant was found guilty of the attempted first degree murder of his wife, Tabatha Downey (Tabatha), and sentenced to 11 years' imprisonment.

¶ 4    Prior to trial, Tabatha requested to invoke her Fifth Amendment right not to incriminate herself as a "perpetrator of a domestic battery" and the aggressor in the incident at issue. The court ruled that Tabatha did not have a Fifth Amendment privilege to avoid testifying. The State mentioned that there were logs of Tabatha's call to 911 on the day of the incident, but no recording.

¶ 5    At trial, Chicago police officer Raymond Archuleta testified that on April 27, 2016, at around midnight, he and Chicago police officer Thomas Baker responded to a domestic disturbance at an apartment. Archuleta heard "faint whimpering" when he approached the apartment door. When he entered the apartment, he saw Tabatha on the ground with her arms at her side, not moving, and defendant on top of her with his chest "focused on her head area." Archuleta removed defendant from Tabatha and saw a pillow fall from her face. Defendant was then arrested.

¶ 6    On cross-examination, Archuleta clarified that defendant held a pillow and released it when Archuleta pulled defendant from Tabatha. Once defendant released the pillow, it dropped from Tabatha's face.

¶ 7    Baker testified that he entered the apartment after Archuleta and witnessed Tabatha motionless on the ground with her arms at her side and defendant on top of her. Tabatha was "silent, not moving" before defendant was removed from her. Baker saw defendant drop a pillow that had been "compressed to Tabatha['s] *** face." Baker and other officers turned Tabatha on

her side to allow her to breathe and she made a "huge gasp." Over defense counsel's hearsay objection, Baker stated that Tabatha told him that defendant stated he would kill her and they both would die that night. According to Tabatha, defendant and Tabatha had fought over defendant suspecting Tabatha of infidelity, and defendant tackled Tabatha onto the floor, squeezed her neck, and smothered her with a pillow.

¶ 8    On cross-examination, Baker testified that he did not observe any injuries to Tabatha's body and she refused emergency medical services.

¶ 9    Tabatha testified that on April 27, 2016, around midnight, she and defendant argued over defendant taking Tabatha's cell phone and texting her colleague to "stay away from [Tabatha]" and to "respect their marriage." When she retrieved her phone, she called the police to tell them that she wanted defendant removed from their apartment because he was "drunk." Defendant took Tabatha's phone again and the couple argued more. Tabatha grabbed defendant's hair, they fell, and defendant landed on top of her. She tried to strike defendant, but he grabbed her wrists and pinned her down.

¶ 10    Tabatha yelled "let me go" and "call the police" until she broke free. She was "swinging wildly" at defendant while he was still straddling her on the ground, and he grabbed a pillow and held it over her "like a shield" as Tabatha attempted to strike him through the pillow. They stayed in that position until the police responded. Tabatha denied that defendant banged her head into the floor, choked her, smothered her with a pillow, or that she passed out and could not fight back. She did not recall what defendant said during the incident and stated that nothing would refresh her memory.

¶ 11    Tabatha spoke with officers after defendant was arrested and removed from the apartment. She recalled telling the officers what the argument was about but did not recall telling them about any threats defendant made toward her. At the station, Tabatha gave a statement to Assistant State's Attorney Elizabeth Brogan. Brogan typed Tabatha's statement, and Tabatha reviewed and signed it. The State showed Tabatha a written statement which Tabatha acknowledged bore her signature. Tabatha could not remember what she had said in the statement because it was "so long ago," she had been "up all night" at the time, and had been drinking prior to the altercation. At trial, she testified about how she remembered the incident.

¶ 12    On cross-examination, Tabatha stated that she bit defendant on his back prior to pulling his hair and them falling to the ground. Tabatha pulled "clumps" of defendant's hair and still had his hair in her hand when the police arrived. Tabatha stated that she did not lie to officers when she spoke to them, but she "went along with" what they were saying and did not "correct" them in order for defendant to be removed from their apartment. Tabatha "embellished" her statement to Brogan because detectives told her that her career could be in jeopardy if defendant filed a complaint against her. Tabatha stated that on June 19, 2016, she gave a signed statement to a private investigator. She did not recall telling the investigator she "lied" when she spoke to Brogan, and if she did say she lied, she "misspoke."

¶ 13    Brogan testified that on April 27, 2016, at around 5:20 a.m., she interviewed Tabatha and defendant regarding the incident. She did not notice that defendant was missing hair. Tabatha chose to have her statement typewritten, with Brogan typing the statement while clarifying the contents with Tabatha. The State showed Brogan the statement, which she identified. The court

admitted the statement over defense counsel's hearsay objection, and Brogan read the statement into the record.

¶ 14    In the statement, Tabatha stated that she and defendant argued after defendant accused Tabatha of infidelity after taking her phone. Once she retrieved her phone, Tabatha called police to inform them that she wanted defendant removed from their apartment. Defendant took Tabatha's phone again, they struggled and fell to the ground, and defendant fell on top of her and restrained her wrists. Tabatha attempted to pull defendant's hair, while yelling at him to get off her and for someone to call the police. Defendant banged Tabatha's head on the floor, and she stiffened her body. He then placed his hands on her neck and strangled her.

¶ 15    Tabatha could not breathe or speak. Defendant told her that they would both die that night. Defendant then placed a pillow over her face, applied pressure, and began suffocating her. Tabatha could not breathe and started to pass out. Tabatha believed that defendant would kill her. She then felt defendant being lifted off her and she gasped for air. Tabatha stated she was not under the influence of alcohol when she gave her statement and that everything in the statement was true and accurate.

¶ 16    On cross-examination, over the State's objection, defense counsel introduced a summary of Brogan's interview with defendant and Brogan read the summary into the record. In the summary, defendant stated that he locked himself in their bedroom with Tabatha's phone and she broke in and attacked him, pulling his hair. Defendant attempted to restrain her, but he never put his hands on her, choked her, or strangled her.

¶ 17    On questioning by the court, Brogan stated that Tabatha did not appear to be under the influence of alcohol during her statement and did not have issues recalling the events of that night.

¶ 18    The State entered a certified copy of defendant's 2006 domestic battery conviction. Defense counsel moved for a directed finding, which was denied.

¶ 19    Defense counsel recalled Tabatha, who read her affidavit given to the private investigator into the record. In the affidavit, Tabatha stated that "much" of the information in her statement to Brogan was untrue and exaggerated in order to get defendant removed from their apartment. A detective told her she did not have to proceed with charges, but if she did not, defendant could make a complaint against her and her "career would be over." On April 27, 2016, defendant was suspicious of her relationship with a co-worker and retrieved her phone to confront him. Defendant locked himself in their bedroom with Tabatha's phone, and she broke into the room to retrieve it. She yelled at defendant, but defendant did not yell at her.

¶ 20    Tabatha was "agitated" and "aggressive" toward defendant, and when he grabbed her phone again, she bit him on the back. She pulled his hair, which she had clumps of when the police arrived, and they fell to the ground with defendant on top of her. Tabatha was swinging at defendant, and defendant only touched her to restrain her from striking him. Defendant did not bang Tabatha's head on the floor or choke her. He retrieved a pillow to shield himself from her strikes but did not hold the pillow over her face or smother her. Tabatha lied to police when she told them that defendant choked her, suffocated her, and told her that she would die. Tabatha stated that she did not fear defendant and that she was the aggressor that night.

¶ 21    The trial judge found defendant guilty of attempted first degree murder. In ruling, the court noted that "unlike a standard domestic violence case," there was "independent eyewitness testimony" from the responding officers who witnessed defendant on top of Tabatha's "lifeless"

body with a pillow over her face. Neither officer testified to seeing clumps of defendant's hair in Tabatha's hands or that defendant was bleeding from the scalp.

¶ 22     Defendant filed a motion to reconsider the verdict and for a new trial, which the court denied. Defendant was subsequently sentenced to 11 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the court also denied.

¶ 23     On direct appeal, defendant alleged that (1) trial counsel was ineffective for failing to argue that defendant was eligible for a reduced sentence due to sudden and intense passion resulting from serious provocation by Tabatha and (2) the trial court imposed an excessive sentence. This court affirmed. *People v. Downey*, 2019 IL App (1st) 170592-U.

¶ 24     On April 9, 2020, defendant filed a *pro se* petition for postconviction relief alleging that, among other claims, trial counsel was ineffective for numerous reasons including, relevant here, failing to utilize a 911 recording where Tabatha stated that defendant would "never hurt [her]." The petition was docketed for second-stage proceedings and postconviction counsel was appointed.

¶ 25     On January 31, 2022, postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) stating:

> "1. I have consulted with [defendant], Robert Downey, by phone, mail, electronic means or in person to ascertain his contentions of deprivation of constitutional rights.
>
> 2. I have examined the record of proceedings at trial, including but not limited to the Common Law Record, Report of Proceedings and all Supplemental Records under Appellate Numbers [*sic*] 1-17-0592 and conducted investigations relevant to the claims in

[defendant's] *Pro Se* Petition and I am not attaching any exhibits or affidavits in support of those claims.

3. I have examined the Appellate decision in <u>People v. Downey</u>, 2019 IL App (1st) 170592 U.

4. I have determined that a Supplemental Post-Conviction Petition is necessary for an adequate presentation of [defendant's] contentions of deprivation of his constitutional rights and I am filing such a petition to be considered with [defendant's] *Pro Se* Petition for Post-Conviction Relief."

¶ 26     In the supplemental petition, counsel alleged that counsel on direct appeal was ineffective for failing to raise the claims in defendant's *pro se* petition.

¶ 27     On May 15, 2023, the State filed a motion to dismiss the petition(s) alleging, relevant here, that defendant was unable to make a substantial showing that his trial counsel was ineffective for failing to utilize the 911 recording. Specifically, the State noted that defendant neglected to support his claim with "affidavits, records, or other evidence" and the claim was therefore conclusory and could not meet either prong set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 28     On September 29, 2023, the court granted the motion to dismiss, concluding that defendant did not establish ineffective assistance of counsel regarding the 911 claim because defendant failed to support the claim with any evidence. As such, defendant could not make a substantial showing of a violation of a constitutional right.

¶ 29     On appeal, defendant argues that postconviction counsel provided unreasonable assistance by failing to attach affidavits, records, or supporting evidence for the claim that trial counsel was ineffective for not using a 911 call that supported defendant's self-defense theory.

¶ 30     The Act allows defendants to challenge their convictions based on an alleged violation of their state or federal constitutional rights. *People v. Jean*, 2024 IL App (1st) 220807, ¶ 28. Postconviction proceedings follow three stages. *Id*. Defendant's petition was dismissed at the second stage. At the second stage, a defendant must make a substantial showing of a constitutional violation. *People v. Zirko*, 2021 IL App (1st) 162956, ¶ 16. Also at this stage, counsel is appointed for indigent defendants and the State may move to dismiss the petition. *Jean*, 2024 IL App (1st) 220807, ¶ 28.

¶ 31     If the State moves to dismiss the petition, the court must "not engage in fact-finding or credibility determinations but must take as true all well-pleaded facts that are not positively rebutted by the original trial record." *People v. Madison*, 2023 IL App (1st) 221360, ¶ 33. If the court determines that a defendant has made a substantial showing of a constitutional violation, the petition proceeds to a third-stage evidentiary hearing. *Id*. If not, the petition is dismissed. *Id*. A dismissal of a petition at the second stage is reviewed *de novo*. *People v. Johnson*, 2024 IL App (1st) 220419, ¶ 65.

¶ 32     In postconviction proceedings, the right to counsel is statutory, not constitutional. *People v. Carson*, 2024 IL App (1st) 221644, ¶ 17. Furthermore, counsel is required to render "reasonable assistance," a standard which is "less than that afforded by the federal or state constitutions." (Internal quotation marks omitted.) *Id*. Postconviction counsel's purpose is not to "protect postconviction petitioners from the prosecutorial forces of the State but to shape their complaints into the proper legal form and to present those complaints to the court." *People v. Addison*, 2023 IL 127119, ¶ 19.

¶ 33 To ensure reasonable assistance, Rule 651(c) provides that counsel must (1) consult with the defendant by phone, mail, or other means to ascertain the defendant's contentions; (2) examine the record of the proceedings at trial; and (3) make the necessary amendments to the *pro se* petition to adequately present the defendant's contentions. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Substantial compliance with this rule is required. *Addison*, 2023 IL 127119**,** ¶ 21. To demonstrate compliance with the rule, counsel may file a certificate making such a showing. Ill. S. Ct. R. 651(c) (eff. July 1, 2017); *People v. Perkins*, 229 Ill. 2d 34, 50 (2007).

¶ 34 Once counsel files a Rule 651(c) certificate, a rebuttable presumption that counsel provided reasonable assistance arises, and the defendant bears the burden of overcoming that presumption by showing that counsel did not substantially comply with the rule. *Addison*, 2023 IL 127119**,** ¶ 21. The rebuttable presumption may be overcome by a defendant showing that counsel failed to make necessary amendments to a *pro se* petition. *Id*.

¶ 35 Counsel is not required, however, to amend a petition to advance frivolous claims. *People v. Gallano*, 2019 IL App (1st) 160570, ¶ 30. Moreover, a court may "reasonably presume postconviction counsel made a concerted effort to obtain evidence in support of postconviction claims, but was unsuccessful." *People v. Wallace*, 2016 IL App (1st) 142758, ¶ 27. Whether postconviction counsel substantially complied with Rule 651(c) is reviewed *de novo*. *Jean*, 2024 IL App (1st) 220807, ¶ 30.

¶ 36 Here, postconviction counsel filed a Rule 651(c) certificate stating that she consulted with defendant, reviewed the trial file including the common law record and transcripts, and filed a supplemental petition augmenting defendant's *pro se* petition with an additional claim, specifically a claim that counsel on direct appeal was ineffective for failing to raise the claims in defendant's

*pro se* petition. She also stated that she would not attach exhibits or affidavits in support of defendant's *pro se* claims. Therefore, as the certificate sets forth that counsel performed the requirements under the rule, there exists a rebuttable presumption that postconviction counsel substantially complied with Rule 651(c) and provided reasonable assistance.

¶ 37    Defendant argues that postconviction counsel failed to substantially comply with Rule 651(c) because counsel failed to attach support to the supplemental petition for the *pro se* claim that trial counsel was ineffective for failing to use the 911 recording to support defendant's self-defense theory.

¶ 38    As stated, counsel is not required to amend a frivolous claim, as that would not be a necessary amendment within the meaning of Rule 651(c). *Gallano*, 2019 IL App (1st) 160570, ¶ 30. Therefore, where there exists a presumption of substantial compliance with the rule, "the question of whether the *pro se* allegations had merit is crucial to determining whether counsel acted unreasonably" by not making necessary amendments to the petition including attaching supporting evidence. (Internal quotation marks omitted.) *Id*. Accordingly, we must determine whether the *pro se* allegation that trial counsel was ineffective in failing to utilize the 911 recording amounted to a meritorious claim.

¶ 39    In examining ineffective assistance of trial counsel claims, this court follows the two-prong test set forth in *Strickland*. *People v. Johnson*, 2021 IL 126291, ¶ 52. A defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance resulted in prejudice. *Id*. To establish prejudice, a defendant must demonstrate a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id*.

¶ 40 Decisions regarding what evidence to present are matters of trial strategy which are "generally immune" from claims of ineffective assistance of counsel. *People v. Dupree*, 2018 IL 122307, ¶ 44; *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38. To prevail on a claim based on a matter of trial strategy, a defendant must establish that counsel's strategy was "so unsound that counsel entirely failed to conduct meaningful adversarial testing of the State's case." *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 37. If it is easier to dispose of an ineffective assistance of counsel claim on the ground that it lacks sufficient prejudice, a court may "proceed directly to the second prong and need not determine whether counsel's performance was deficient." *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 41 Here, defendant has failed to show that he was prejudiced by counsel's decision not to use the 911 call at trial. To start, the State noted prior to trial that no recording of the 911 call existed and that there were only call logs. Even if a recording of the 911 call did exist or if Tabatha averred in an affidavit that she stated on the 911 call that defendant would never hurt her, and such evidence was provided with defendant's postconviction petition, this evidence would not have resulted in a different outcome at trial. Both Archuleta and Baker testified to witnessing Tabatha unmoving on the ground with defendant on top of her holding a pillow over her face. Baker stated that once defendant was removed from Tabatha and the pillow fell, she made a "huge gasp" and stated that defendant said that he would kill her. The trial court primarily relied on Archuleta's and Baker's testimony in its finding of guilt, and mentioned that the officers' "independent eyewitness testimony" distinguished this case from other domestic violence cases. Given the above, it is unlikely that Tabatha's supposed statement to 911 that defendant would not hurt her would have resulted in a different outcome at trial, and defendant's ineffective assistance claim is meritless.

As this claim lacks merit, postconviction counsel was not unreasonable in failing to amend this claim with supporting evidence. As a result, defendant has failed to overcome the presumption that postconviction counsel rendered reasonable assistance under Rule 651(c) in regard to this claim.

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 43    Affirmed.