2026 IL App (1st) 240757-U
No. 1-24-0757

SIXTH DIVISION
May 15, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 CR 12039 |
| | ) | |
| CORNELIUS MOSSETTE, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1 *Held:* The trial court did not err in denying defendant's motion for a new trial that alleged trial counsel was ineffective. Further, its finding that defendant caused the victim severe bodily injury was not against the manifest weight of the evidence.

¶ 2 Following a jury trial, defendant Cornelius Mossette was found guilty of two counts of attempted first-degree murder with a firearm (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)), and one count each of aggravated battery of a child under 13 years old causing great bodily harm (*id.* § 12-3.05(b)(1)), aggravated battery while armed with a firearm (*id.* § 12-3.05(e)(1)), and aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). He was sentenced to consecutive terms of 21 years'

imprisonment for the two attempted murder counts, and a concurrent term of 4 years' imprisonment for aggravated discharge of a firearm. On appeal, defendant contends that the trial court erred in denying his motion for a new trial where he established that he was denied the right to effective assistance of counsel. He also argues that the trial court erred in sentencing him to consecutive sentences for attempted murder, because the evidence did not establish that he inflicted "severe bodily injury." For the following reasons, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4        Defendant was charged by indictment with multiple offenses arising from an incident on July 25, 2018, wherein defendant allegedly discharged a firearm at Jose Morales, his minor daughter J.M., and Morales' friend Joshua Knapp. Morales and J.M. were both struck by the gunfire.

¶ 5        Defendant was represented by private counsel, Glenn Jazwiec, during pretrial and trial proceedings. The State proceeded with the following counts at trial: attempted murder of J.M. and Morales, aggravated battery of J.M. and Morales, and aggravated discharge of a firearm at Knapp.

¶ 6                                          A. Jury Trial

¶ 7        At trial, the evidence established that J.M. was born on September 20, 2014. On July 25, 2018, Morales, J.M., and Knapp walked on 48th Street near Damen Avenue. There, they observed a vehicle stopping approximately 20 feet from them. The vehicle was described by another bystander as a blue or gray four-door sedan with dark tinted windows. Photos of the vehicle, a dark blue-gray BMW sedan, were included in the record on appeal and have been viewed by this court.

¶ 8        The back passenger of the sedan, identified by Morales and Knapp as defendant, asked if Morales was "good." According to Morales, he responded, "yeah I'm good." Defendant continued to ask Morales the same question, so Morales said, "you're on bull***" and stated that he was with

his daughter. Defendant responded that he "don't give a f***," raised his right hand, and drew a firearm from his waist across his face.

¶ 9       Morales testified that he began to run to get away from his daughter because he knew what defendant "was going to do." According to Knapp, defendant fired "four or five" times at them, and Knapp loaded his firearm and returned fire. He did not know whether he hit the vehicle. During this time, Morales felt a bullet hit his foot. He turned and saw J.M. on the ground, so ran back toward her. J.M. sat on the ground, and Morales saw blood where she was sitting. J.M. had sustained gunshot wounds to both knees.

¶ 10      The vehicle then sped onto Damen Avenue. Morales testified that defendant was wearing a black hat, and Morales noticed his "face" and his "eyes," which were "bug-eyed." On cross-examination, Morales stated that defendant's hair was "poofy out [sic] the hat," but he was not able to see defendant's hairstyle and that he described him as "black with a black hat." Morales did not know defendant and had never seen him before the shooting. Morales also stated that he knew of a rapper named "King Von" but had never met him. Morales denied that King Von was the person who shot him.

¶ 11      The police soon arrived, and Morales was "panicking" and "crying" asking them to help J.M., because she had "turned pale, and her eyes starting rolling in the back of her head." The police took J.M. and Morales to the hospital, where J.M. was treated for approximately ten days. Morales described his injury as a "deep graze" to his foot which "knocked a chunk out." Chicago police officer Luis Saldana responded to the scene where J.M. was "bleeding profusely" from both legs and had "started changing color." Saldana instructed his partners to take J.M. to the hospital.

¶ 12      The State published footage from Saldana's bodyworn camera. This footage, with audio, is in the record on appeal and has been viewed by this court. The footage depicts Saldana arriving

on scene, where J.M. is lying on the sidewalk surrounded by bystanders. The officers pick up J.M. and move her to their vehicle. When they remove J.M., a pool of blood is visible on the sidewalk where she was lying. Saldana enters the rear of the vehicle with J.M., and he and another officer apply pressure to her wounds, which are bleeding through the tourniquets. Morales rides in the front passenger seat of the police vehicle. When they arrive at the hospital, Saldana and the other officer carry J.M. as they sprint through the hospital and deliver her to a trauma room in the emergency room.

¶ 13    J.M. was treated by Dr. John Senko, an attending physician at the emergency room at the University of Chicago Comer Children's Hospital. When J.M. arrived, she was awake, alert, and crying. Her injuries were gunshot wounds to both knees, and Dr. Senko opined that each knee was struck by one bullet. The two wounds on the front of J.M.'s left knee were "superficial" in that they were "just through the overlying tissue over her knee" and did not injure her bone. J.M.'s right knee also had two wounds, one of which was "on the anterior portion" of her knee, and the second of which was "behind her knee at the very superior portion of her calf muscle." X-rays showed that her right shinbone had been shattered "to about the midline of the bone" and revealed the presence of "bony fragments" in the soft tissue behind her right knee.

¶ 14    Dr. Senko testified that a child's bone structure is "immature" and has "growth plates that run across the distal part of the long bone." J.M.'s injury to her right knee included both the area above and below the growth plate. Given the damage to J.M.'s shin bone, Dr. Senko was concerned that she could suffer a "lack of growth on that side of her shin."

¶ 15    While treating J.M., Dr. Senko found adequate circulation to her left leg, but not to her right foot or ankle, so he was concerned that her artery was injured. J.M. was also anemic and had low blood pressure, so she received a blood transfusion. Further testing showed that one segment

of her artery was "compressed or damaged," so J.M. was admitted to the pediatric intensive care unit for further monitoring.

¶ 16        Seven fired cartridge cases, metal fragments, and swabs of blood were recovered from the scene. Although the evidence technician photographed the scene as well, his camera malfunctioned so photographs were unavailable.

¶ 17        The day of the incident, police officers reviewed footage from police observation device (POD) cameras in the area and observed a BMW sedan with "easily identifiable" stickers affixed to the windshield on the passenger's side.[1] On the footage from one of the POD cameras, officers observed that the sedan "appears to stop along side" one of the victims "and then subject [*sic*] running away as the shots were being fired." Later that day, officers observed the same sedan parked in a nearby location and surveilled the vehicle. "Maybe a couple hours later," the sedan was observed again in the area, and was curbed for a "vehicle violation." Defendant sat in the rear passenger seat, was unable to provide a driver's license or state identification card, and told the officers that his name was "Dawon Pouncy." Kennedy verified the identities of the people in the vehicle and was unable to verify the existence of an individual named Dawon Pouncy. The driver was arrested for driving on a suspended license. Defendant asked the officers if he could retrieve his hat from the back seat, but they did not allow him to do so. At the station, Kennedy investigated defendant and eventually learned his name was Cornelius Mossette.

¶ 18        Footage from a police officer's bodyworn camera depicts the traffic stop. This footage is in the record on appeal and shows the officers approach a blue-gray sedan with its windows rolled

---

[1] Although footage from multiple POD cameras was entered into evidence, only footage from the camera facing northbound on Damen Avenue toward 48th Street is included in the record on appeal. To the extent that these cameras allegedly captured the shooting and the subsequent route of the sedan, any doubts or deficiencies arising from an incomplete record will be resolved against defendant. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

down. A back window is heavily tinted. Defendant, who is sitting in the back rear passenger seat, tells the officers that he does not have an "ID" and has never been arrested. He gives his name as "Dawon Pouncy" and his address as Four West "36th-37th" Street. He states that he is 21 years old and had never had an ID because he "never went to go get one" as he was attending school. Later, defendant is standing on the sidewalk and asks to retrieve his hat from the vehicle.

¶ 19　　　　On July 26, 2018, Morales met with Chicago police detectives who showed him photo arrays at the hospital. Morales identified his signed photo/lineup advisory form and a signed photo array in which he identified defendant as the shooter. On cross-examination, Morales stated that he viewed the photo array "four hours" after the shooting. He did not tell police that the shooter said "what's up," or that he responded, "what's up, I'm with my daughter." He also denied informing officers that he said, "whatever man, you a b***" and did not inform them about Knapp discharging a firearm at the sedan because Knapp was his friend and he did not want "to get him in trouble."

¶ 20　　　　On August 1, 2018, a police officer drove near the 6600 block of Dr. Martin Luther King Jr. Drive attempting to locate defendant. There, he saw defendant, who fled to a different building. The officer followed defendant and arrested him on the seventh floor of the building.

¶ 21　　　　Knapp viewed photo arrays at the police station on August 2, 2018, and picked defendant's photo from one of the arrays as the shooter. Knapp identified the photo array he viewed and signed. At the time, Knapp told the detectives that he was "50 percent sure" that defendant was the shooter but later said that he was both "100 percent" and "75 percent" sure. Knapp clarified that "75 percent" sure was more accurate when he viewed the photo arrays, and did not know why he said "50 percent." Knapp agreed with the State's assessment that he did not prefer "to be involved in cases."

¶ 22    Knapp was arrested on August 18, 2018, and the arresting officer recovered a 9-millimeter firearm from him, which she inventoried.

¶ 23    On October 22, 2018, a search warrant was executed for an apartment at the 6400 block of South Dr. Martin Luther King Jr. Drive, where a Glock semiautomatic handgun and ammunition was discovered in the foyer closet and inventoried. On cross-examination, the evidence officer stated that one of three people who were in the apartment during the execution of the search warrant was Davyon King, known as King Von. During the search, McClain did not find documents related to defendant.

¶ 24    A search warrant was also executed regarding the BMW sedan. The evidence technician photographed the vehicle, swabbed it for biological material, performed a gunshot residue test, and collected items of evidentiary value. The vehicle contained clothing, including a black White Sox baseball cap and fanny pack. The items were photographed and the photos were identified by Balcerzak and entered into evidence. The vehicle was registered to Antwan Teasley.

¶ 25    A firearms tool mark examiner examined the seven fired cartridge cases recovered at the scene and determined that they were fired from two different 9-millimeter firearms: four were fired from the firearm recovered from the apartment and three from Knapp's firearm.

¶ 26    Since the incident, J.M. needed to have two or three surgeries, the most recent of which was approximately one month prior to trial. Since the shooting, J.M. walks with a limp, and "falls easily" when she tries to run. Morales identified a video of J.M. depicting how she walked at the time of trial. This video was published and is in the record on appeal and has been viewed by this court. It depicts J.M., who stated that she was five years old. She walks toward the camera with a limp and is wearing a brace on her right leg. He also identified a photograph of J.M. in a wheelchair soon after she was initially released from the hospital in 2018.

¶ 27    Jazwiec proceeded by introducing multiple stipulations, First, if called, Chicago police detective Joseph Merco would testify that on July 25, 2018, he interviewed Morales, who told him that "a dark skin, possibly black, [passenger] sitting behind the front passenger seat stated, what's up." Additionally, a forensic scientist would testify that, based on her examination and analysis of evidence recovered from the BMW, she was unable to conclude whether gunshot residue from a fired weapon had been deposited.

¶ 28    In closing, Jazwiec argued that Morales and Knapp were not credible in identifying defendant as the shooter, highlighting Morales' inconsistent statements to police officers and initial refusal to tell them about Knapp. He also emphasized that Morales' identification of defendant was unreliable, including his failure to observe and subsequently describe defendant accurately. He also noted the lack of physical evidence tying defendant to the shooting, and the lack of indicia of defendant's residency for the apartment where the search warrant was executed.

¶ 29    Despite Jazwiec's closing argument questioning the credibility of the eyewitnesses and the lack of physical evidence tying defendant to the shooting, the jury found defendant guilty of two counts of attempted first-degree murder, two counts of aggravated battery with a firearm, and one count of aggravated discharge of a firearm.

¶ 30                    B. Allegations of Ineffective Assistance of Counsel

¶ 31    On February 18, 2022, defendant asserted that he wished to proceed *pro se* for the remainder of proceedings. He stated that he had "issues" with Jazwiec and commented that Jazwiec did not consider using certain witnesses who would have provided exonerating evidence and did not allow him to pursue a bench trial. The court admonished defendant, including explaining the drawbacks of proceeding without counsel, and allowed him to proceed *pro se*.

¶ 32        On May 11, 2023, the court appointed the office of the Public Defender to represent defendant during the remainder of posttrial proceedings.

¶ 33        On August 4, 2023, defendant *pro se* filed a motion raising allegations of ineffective assistance of trial counsel. In particular, defendant contended that Jazwiec had withheld information related to the case from him, did not proceed with a viable self-defense claim, and did not call the two eyewitnesses who were in the vehicle who would have exonerated him.

¶ 34        Defense counsel subsequently filed a motion and two amended motions for a new trial, arguing that Jazwiec was ineffective because he did not present expert testimony regarding human memory and perception, call another eyewitness, Dominik Garcia, who would have cast doubt on Morales' identification, engage in plea negotiations with the State, inform defendant of the possible sentencing ranges if he were convicted, and show defendant discovery and the trial stipulations before the trial. Counsel also contended that the State did not prove defendant guilty beyond a reasonable doubt.

¶ 35        Counsel attached a page from a police report to the first motion for a new trial. The report noted that detectives interviewed Garcia who stated that he heard multiple gunshots from his balcony on the 4800 block of South Damen Avenue. He then saw a gray sedan fleeing south on Damen "with (4) Hispanics occupying said vehicle," but Garcia could not further describe them.

¶ 36        On March 14, 2024, the court held a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), to investigate defendant's claims of ineffective assistance of counsel. During the hearing, the State called Jazwiec, who testified that he had been licensed for 36 years and represented defendant in 2020. Jazwiec met with defendant on an ongoing basis and reviewed discovery with him. Jazwiec had asked the State if they would "make a probation offer" but defendant wished to proceed to trial "as soon as possible." Jazwiec did not consider an identification witness to be

appropriate for defendant's trial because he planned to attack the manner the identification was made and did not want to "tip *** off" the State regarding his trial strategy. Jazwiec did not call Garcia because he was not an eyewitness and had been vaguely described. Jazwiec also reviewed all stipulations with defendant.

¶ 37        On cross-examination, Jazwiec stated that he discussed the possible sentencing ranges with defendant, and defendant seemed to understand the range would be significant. Defendant never asked Jazwiec to enter plea negotiations with the State, telling him that "I want my trial."

¶ 38        Defendant testified that Jazwiec never informed him about the sentencing ranges for the charged offenses or showed him relevant discovery and the trial stipulations. Defendant also requested that Jazwiec engage in plea negotiations with the State, and Jazwiec reported that the State was "willing to negotiate" but Jazwiec would not accept "anything unless it [is] a dismissal or an apology."

¶ 39        On cross-examination, defendant stated that he twice asked Jazwiec what the sentencing ranges were and Jazwiec responded, "kid, don't worry about that." Jazwiec only showed defendant "papers" which stated that Morales was able to identify him in a photo array and Knapp could only identify defendant "50 percent." Defendant stated that he knew that Jazwiec never showed him the stipulations because he knew what a stipulation was.

¶ 40        On redirect examination, defendant testified that Jazwiec never mentioned hiring an expert in human perception and memory or telling defendant that it would be a good idea to hire such an expert.

¶ 41        Defense counsel argued that the instant case "needed an expert in human perception [and] memory" because Morales' identification was not reliable due to the stress of the situation and his

lack of familiarity with defendant. He also argued that defendant had the right to know the sentencing ranges for the offenses.

¶ 42     The court denied defendant's motion for a new trial. In ruling, it noted that Jazwiec's decision not to call an expert witness was a matter of trial strategy, and an attorney is not necessarily ineffective if he does not call an expert witness in every case involving identification issues. Jazwiec's decision not to call Garcia was also a matter of trial strategy and Garcia's testimony likely would not have helped the defense. The court did not believe that Jazwiec did not discuss the discovery and the stipulations with defendant. But, taking that as true, it would not "have changed anything." Defendant had no right to a plea offer from the State, especially where the State's case was strong, and defendant's conclusion about the possibility of receiving a more favorable outcome had he known the sentencing ranges was speculative. Further, defendant suffered no prejudice from purported deficiencies in Jazwiec's performance, and the court found that the State proved the elements of the offenses beyond a reasonable doubt.

¶ 43                                    C. Sentencing

¶ 44     The matter proceeded to a sentencing hearing where defendant's presentence investigation report (PSI) established that defendant had been convicted of residential burglary twice in circuit court case numbers 12 CR 21411 and 10 CR 3204 and sentenced to eight years' imprisonment and "Boot Camp-four years," respectively. He was involved with the street gang Gangster Disciples from the ages of 12 to 23 but denied having any rank or role with the gang. Defendant had a strong relationship with his mother and was very close with his half-brother and sister and denied abuse or neglect, although the Department of Children and Family Services (DCFS) had been involved because he ran away from home at age 13. Defendant did not graduate high school or complete his high school equivalency test but planned to do so.

¶ 45    Initially, the parties disagreed as to whether consecutive sentencing was mandatory with regard to the two attempted murder charges. The State contended that it was mandatory because J.M. suffered severe bodily injury. Defense counsel contended that the injuries to J.M. were insufficient to establish severe bodily injury because "not all gunshot wounds *** constitute severe bodily injury." The court disagreed and found the injuries to J.M. to be severe bodily injury but the gunshot wound to Morales' foot was not.

¶ 46    In aggravation, the State argued that defendant was on parole at the time of the offense for his 2012 residential burglary. The State contended that a more substantial sentence was necessary to serve as a deterrent because the case was "senseless violence where a three-year-old was severely injured." The State argued that J.M. needed multiple surgeries and had damage to her growth plate and artery, resulting in her continued walking with a limp. The State requested a sentence "that reflects the seriousness of what occurred."

¶ 47    In mitigation, defense counsel argued that a lengthy sentence would not act as a deterrent. Counsel outlined the difficulty of his life, including DCFS involvement when he was 13 years old. He also noted that defendant had a child that he "wants to get back to." Defense counsel additionally argued that "[a]s awful as" J.M.'s injuries were, they did not meet the standard for severe bodily injury to trigger consecutive sentencing. Defense counsel also contended that severe bodily injury to both J.M. and Morales was required to trigger consecutive sentencing.

¶ 48    Defendant declined to speak in allocution.

¶ 49    The court merged the aggravated battery counts into two counts of attempted first-degree murder with a firearm, and sentenced defendant to consecutive terms of 21 years' imprisonment on those counts, and a concurrent term of 4 years' imprisonment for aggravated discharge of a

firearm.[2] In relevant part, the court found that J.M. was "basically handicapped" after the shooting. The court noted that the triggering offense for consecutive sentences was the attempted murder of J.M.

¶ 50     Defense counsel filed a motion to reconsider defendant's sentence, arguing in relevant part that the record did not support the court's finding that J.M. sustained severe bodily injury to trigger consecutive sentences. The court denied the motion.

¶ 51                                   II. ANALYSIS

¶ 52     On appeal, defendant first argues that the trial court erred in denying his motion for a new trial where he established that Jazwiec performed ineffectively. He contends that Jazwiec did not present expert testimony regarding human perception and memory or call Garcia as a witness. Additionally, he argues that Jazwiec failed to show him discovery and stipulations, failed to inform him about the potential sentencing ranges, and refused to participate in negotiations with the State. Defendant contends that he suffered prejudice due to these errors.

¶ 53                         A. Ineffective Assistance of Counsel

¶ 54     We review claims of ineffective assistance of counsel using the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To establish a claim of ineffective assistance, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. To establish prejudice, the defendant must show a reasonable probability that, but for the errors, the result of the proceeding

---

[2] The court's oral pronouncement establishes a concurrent sentence of 4 years' imprisonment for aggravated discharge of a firearm, but the mittimus reflects a term of 5 years' imprisonment. "When the oral pronouncement of the court and the written order are in conflict, the oral pronouncement controls." *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 87.

would be different; namely, a "probability sufficient to undermine confidence in the outcome." *Id*. A defendant must satisfy both prongs to raise a successful claim. *Id*.

¶ 55    Here, defendant raised the *pro se* allegations of ineffective assistance of counsel after trial. Such a posttrial motion is governed by the procedure developed in *People v. Krankel*, which "encourages the trial court to fully address these claims" and "narrow the issues to be addressed on appeal." *People v. Roddis*, 2020 IL 124352, ¶ 34. Under *Krankel*, after a *pro se* defendant brings claims of ineffectiveness to a trial court's attention, the court must conduct a preliminary inquiry into the factual basis of the claim and then determine whether to appoint counsel or deny the motion. *People v. Ayres*, 2017 IL 120071, ¶ 11. Here, the trial court appointed new counsel after defendant raised his *pro se* claim of ineffectiveness, thereby bypassing the preliminary inquiry.

¶ 56    We review claims of ineffective assistance of counsel under a bifurcated standard where we defer to the trial court's factual findings unless they are against the manifest weight of the evidence but review *de novo* the legal issue of whether counsel's actions support a claim of ineffective assistance. *People v. Kline*, 2024 IL App (1st) 221595, ¶ 65.

¶ 57                    1. Failure to Present an Expert Identification Expert

¶ 58    Defendant first contends that Jazwiec was ineffective for failing to present an expert witness who would testify regarding human perception and memory. Defendant contends that his identification was made under conditions which undercut its reliability. Thus, the failure to call an expert witness to testify human perception and memory was, not only, objectively unreasonable but prejudiced defendant.

¶ 59    In *People v. Lerma*, the supreme court found that a trial court abused its discretion in denying the defendant's request to allow an expert in eyewitness identifications to testify. *People v. Lerma*, 2016 IL 118496, ¶ 25. It noted four factors to be considered in assessing the relevance

and appropriateness of such expert testimony: "(1) the importance of the eyewitness identifications to the State's case, (2) whether the factors identified by the expert as undermining the reliability of eyewitness identifications were present in the case, (3) whether the eyewitnesses were available for cross-examination, and (4) the eyewitnesses' prior familiarity with the suspect." *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 41; see *Lerma*, 2016 IL 118496, ¶ 26.

¶ 60    Additionally, decisions regarding whether to call particular witnesses are matters of trial strategy, which do not ordinarily support claims of ineffective assistance of counsel. *People v. Peterson*, 2017 IL 120331, ¶ 80. "[C]ounsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger." *Elliott*, 2022 IL App (1st) 192294, ¶ 46. A defendant is entitled to competent rather than perfect representation, and mistakes in strategy or tactics do not, alone, render counsel's representation incompetent. *People v. Johnson*, 372 Ill. App. 3d 772, 777-78 (2007). Due to the "variety of factors" affecting trial strategy, "such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002). An ineffectiveness claim based in trial strategy will only be successful "if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case." *Peterson*, 2017 IL 120331, ¶ 80.

¶ 61    In *Elliott*, the trial court determined that counsel's decision not to present eyewitness identification testimony was a matter of trial strategy where "nothing in the record demonstrates that it was not." *Elliott*, 2022 IL App (1st) 192294, ¶ 38. Here, Jazwiec expressly testified during the *Krankel* proceeding that he chose not to pursue an eyewitness expert because he planned to challenge the credibility of the eyewitness identifications and did not want to "tip *** off" the

State regarding his trial strategy. See *id*. ¶ 45 (another reason counsel could have decided against calling an eyewitness identification expert is that by doing so, the State would have the opportunity to bolster the accuracy of the eyewitness identification). Here, Jazwiec challenged the witnesses' identifications through cross-examination, and focused his closing argument on the deficiencies in their testimonies. Although Jazwiec's strategy was ultimately unsuccessful, we cannot say that it was "so unsound" that he failed "to conduct meaningful adversarial testing of the State's case." See *Peterson*, 2017 IL 120331, ¶ 80.

¶ 62                    2. Failure to Adequately Investigate and Call Witnesses

¶ 63        Defendant further argues that Jazwiec failed to call Garcia as a witness because Garcia would have established that he observed four "Hispanic" people in the vehicle involved in the shooting. Defendant contends that this testimony could have exonerated him as the shooter.

¶ 64        As noted, decisions regarding whether to call particular witnesses are matters of trial strategy. *id*. "The failure to interview witnesses may indicate incompetence, particularly when the witnesses are known to trial counsel and their testimony may be exonerating," but whether the failure to investigate amounts to incompetency "depends on the value of the evidence to the case." *People v. Steidl*, 177 Ill. 2d 239, 256 (1997).

¶ 65        Here, defendant relies on one page taken from the police report regarding the investigation where detectives describe interviewing Garcia who observed the incident from his "balcony" near the scene. No other evidence established whether Morales' testimony would have been reliable. The two State eyewitnesses were both much closer to the vehicle and the shooter. Even assuming, *arguendo*, that Garcia could have provided exculpatory evidence, the value of such evidence to change the outcome of the trial is speculative. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice.").

Accordingly, we reject defendant's assertion that Jazwiec was ineffective for failing to call Garcia as a witness.

¶ 66                    3. Failure to Share Information with Defendant and Negotiate with the State

¶ 67        Finally, defendant argues that Jazwiec was ineffective for not giving him discovery materials, reviewing trial stipulations, advising him as to the sentencing range for the offenses, or negotiating with the State on his behalf. He contends that Jazwiec's failure to keep him apprised as to important issues in his case affected the decisions he could make regarding the case and, therefore, prejudiced him.

¶ 68        As an initial matter, the court did not believe that Jazwiec did not discuss the discovery and the stipulations with defendant. Jazwiec also testified during cross-examination that he discussed the possible sentencing ranges with defendant, and defendant told him "I want my trial" as opposed to continued negotiations with the State. We must defer to the court's factual determinations. See *Kline*, 2024 IL App (1st) 221595, ¶ 65. Nevertheless, even assuming that Jazwiec had a duty to confer with defendant regarding the above issues and negotiate with the State on his behalf, defendant has not established that counsel's alleged failure to do so prejudiced him. Indeed, defendant provides no argument as to how the outcome of his trial would have been different had his counsel informed him as to the above issues or negotiated more aggressively with the State. Again, defendant must establish actual prejudice rather than speculation as to prejudice to meet the standard for *Strickland*. *Bew*, 228 Ill. 2d at 135. Defendant has not established a reasonable probability that but for Jazwiec's actions, the result of his trial would have been different, and so his claim of ineffective assistance fails. See *Veach*, 2017 IL 120649, ¶ 30.

¶ 69    In sum, the evidence does not establish that Jazwiec's performance was objectively unreasonable under prevailing professional norms, and the deficient performance prejudiced the defendant. See *id*.

¶ 70                                B. Severe Bodily Injury

¶ 71    Defendant further contends that the trial court erred in sentencing him to consecutive terms for his two attempted murder convictions because the trial court erroneously found that J.M. sustained severe bodily injury. He contends that the resulting sentence was "not proportionate to the crimes" and did not "serve to restore [d]efendant to useful citizenship." Notably, defendant only challenges the court's imposition of mandatory consecutive sentences due to its finding that J.M. sustained severe bodily injury and does not dispute that the sentences were otherwise excessive.

¶ 72    Under the Unified Code of Corrections, when a court imposes multiple sentences at the same time, generally the sentences must run concurrently. 730 ILCS 5/5-8-4(a) (West 2024). An exception to this rule mandates a court to impose consecutive sentencing when one of the offenses for which the defendant has been convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury. 730 ILCS 5/5-8-4(d)(1) (West 2024). We will reverse a trial court's factual finding of severe bodily injury required for consecutive sentencing only if it is against the manifest weight of the evidence. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). "A finding is against the manifest weight of the evidence only if the opposite is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id*.

¶ 73    Here, we find no error with regard to the court's conclusion that J.M. suffered severe bodily injury, necessitating the imposition of mandatory consecutive sentences. The evidence established that defendant shot J.M., a three-year-old girl, in both knees. J.M. bled profusely, and testimony

established that she grew pale and her eyes had rolled back, which alarmed Morales. Police officers rushed her to the hospital where she was immediately treated by emergency room personnel. Further evidence established that, while the wounds to her left knee were superficial, the gunshot wounds to her right knee shattered part of her right shinbone and impacted her growth plate in that leg. The wounds in J.M.'s right leg also damaged her artery in that leg, so she needed additional monitoring in the pediatric intensive care unit. J.M. needed several surgeries as of the time of trial and walked with a limp. Although some injuries caused by gunshot wounds do not meet the standard for severe bodily injury, we do not agree with defendant that this is such a case. See *People v. Ruiz*, 312 Ill. App. 3d 49, 63 (2000) (a gunshot wound to a police officer's knee was not severe bodily injury as he only felt a sharp pain to his knee and declined immediate medical treatment).

¶ 74 Accordingly, we do not find that the court's finding of severe bodily injury was "unreasonable, arbitrary, or not based on the evidence presented." See *Deleon*, 227 Ill. 2d at 332. As the trial court's finding of severe bodily injury was not manifestly erroneous, the court had no discretion in imposing consecutive sentences. See 730 ILCS 5/5-8-4(d)(1) (West 2024).

### III. CONCLUSION

¶ 75 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 76 Affirmed.